THE HARPER GROUP AND INCLUDIBLE SUBSIDIARIES, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 33761-85.        Filed January 24, 1991.

*Paul J. Sax, William L. Riley,* and *Andrew W. Stroud,* for the petitioners.

*Eugene H. Ciranni* and *Cynthia K. Hustad,* for the respondent.

JACOBS, *Judge:* Respondent determined the following deficiencies in petitioners' Federal income taxes:

| Year | Deficiency |
| --- | --- |
| 1981 | $5,224,177 |
| 1982 | 2,114,098 |
| 1983 | 3,439,865 |

After concessions, the issues for decision are: (1) Whether insurance premiums paid by certain domestic subsidiaries of

The Harper Group (Harper) to Rampart Insurance Co., Ltd. (Rampart), an indirectly wholly owned subsidiary of Harper, are deductible under section 162,[1] and if not (2) whether the premiums paid by certain foreign subsidiaries of Harper to Rampart constitute constructive dividends to Harper.

Amounts paid for insurance are deductible business expenses. Sec. 162; sec. 1.162-1(a), Income Tax Regs. Amounts set aside for the payment of anticipated losses through reserves or otherwise, as a plan of self-insurance, are not.[2] *Spring Canyon Coal Co. v. Commissioner,* 43 F.2d 78 (10th Cir. 1930); *Pan-American Hide Co. v. Commissioner,* 1 B.T.A. 1249 (1925); *Humana Inc. v. Commissioner,* 88 T.C. 197, 213 (1987), affd. in part and revd. in part 881 F.2d 247 (6th Cir. 1989). Captive insurance transactions, such as the one before us, straddle the fence between ordinary insurance and self-insurance.

The deductibility of premiums paid to a captive insurer[3] has been before this and other courts on numerous occasions. See *AMERCO & Subsidiaries and Republic Western Insurance Co. v. Commissioner,* 96 T.C. 18 (1991); *Gulf Oil Corp. v. Commissioner,* 89 T.C. 1010 (1987), affd. on this issue, revd. on other issues 914 F.2d 396 (3d Cir. 1990); *Humana Inc. v. Commissioner, supra; Clougherty Packing Co. v. Commissioner,* 84 T.C. 948 (1985), affd. 811 F.2d 1297 (9th Cir. 1987); *Carnation Co. v. Commissioner,* 71 T.C. 400 (1978), affd. 640 F.2d 1010 (9th Cir. 1981). See also *Beech Aircraft Corp. v. United States,* 797 F.2d 920 (10th Cir. 1986); *Stearns-Roger Corp. v. United States,* 774 F.2d 414 (10th Cir. 1985), affg. 577 F. Supp. 833 (D. Colo. 1984); *Crawford Fitting Co. v. United States,* 606 F. Supp. 136 (N.D. Ohio 1985); *Mobil Oil Corp. v. United States,* 8 Cl. Ct. 555 (1985). Except for *AMERCO & Subsidiaries and Republic Western Insurance Co. v. Commissioner, supra, Crawford Fitting Co. v. United States, supra,* and *Humana Inc. v. Commissioner, supra* (in part), the arrangement involved in each of those cases, although styled as insurance, was found to be self-insurance.

---

[2]Losses incurred by the self-insured taxpayer are deductible (if at all) only in the year paid out from the reserve fund.

[3]As used herein, a captive insurance company is a corporation whose stock is owned by one or a small number of companies and which handles all or a part of the insurance needs of its shareholders or their affiliates.

The case law in the captive insurance arena draws a dichotomy between true insurance and arrangements which have been found to constitute, in substance, self-insurance. For the reasons hereinafter set forth, we find that Harper's captive insurance arrangement falls on the insurance side of the line; thus, we conclude that the premiums paid by the Harper domestic subsidiaries to Rampart are deductible business expenses.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and accompanying exhibits are incorporated herein.

### *Background*

Harper is a California corporation that had its principal office in San Francisco, California, at the time the petition was filed. It is a holding company which directly and indirectly owns subsidiaries in the United States and throughout the world. The subsidiaries engage in a number of businesses related to the international shipment of cargo by air and sea, including freight forwarding. Each subsidiary handles an extensive variety of cargo and incurs liability in different capacities, such as an indirect air carrier, an airline agent, an ocean freight forwarder, a steamship agent, a breakbulk agent, a clearing agent, and a customshouse broker.

Air freight operations are conducted principally through Harper's wholly owned subsidiary, Circle Airfreight Corp. (CAC), a California corporation, and CAC's foreign subsidiaries. Ocean freight operations are conducted principally through Harper's wholly owned subsidiary, Harper Robinson & Co. (Harper Robinson), a California corporation.

During the years in issue (1981-83), Harper Robinson owned 60 percent and CAC owned 40 percent of Western Navigation (Far East), Ltd. (WNFE), a Hong Kong company. WNFE was Harper's operating subsidiary in Hong Kong, engaging in both air and ocean freight forwarding. WNFE owned 100 percent of Rampart, a Hong Kong company.

In the course of their international air and ocean freight forwarding businesses, Harper's subsidiaries incur legal liability under bills of lading, forwarder receipts, air way-bills, tariffs, contracts, etc., pursuant to applicable treaties, statutes, and international law for loss or damage to their customers' cargo.

International freight forwarders customarily obtain marine liability insurance (for both ocean and air shipment) for protection against potential liability. Customers of freight forwarders and indirect air carriers customarily obtain shipper's interest cargo insurance to supplement the liability coverage provided by applicable treaties, statutes, and international law.

Prior to 1969, Harper purchased marine legal liability insurance and its customers purchased shipper's interest insurance through various unrelated insurance companies. In 1969, CAC and Harper Robinson obtained marine cargo insurance through an open cargo policy with Commercial Union Insurance Co. (Commercial Union), which is unrelated to Harper and its subsidiaries.[4] The Commercial Union open cargo policy not only insured the legal liability of CAC and Harper Robinson but also allowed them to provide shipper's interest cargo insurance to their customers.

Harper and 13 of its domestic subsidiaries (which included CAC, J.R. Michels, Inc., and Circle Airfreight Japan, Ltd.[5]) filed consolidated Federal income tax returns for the years in issue. In the consolidated returns, deductions were claimed for insurance premiums paid to Rampart by the three aforementioned domestic subsidiaries of Harper as follows:

| Domestic subsidiaries | 1981 | 1982 | 1983 |
|---|---|---|---|
| CAC | $894,935 | $831,015 | $879,313 |
| J.R. Michels, Inc. | 117,000 | 117,000 | 117,000 |
| Circle Airfreight Japan, Ltd. | 28,800 | 28,800 | 28,800 |
| | 1,040,735 | 976,815 | 1,025,113 |

Respondent disallowed the deductions for the aforementioned insurance premiums and increased the consolidated

[4]In the marine insurance industry, even though an insured may make many different shipments to many different destinations, typically only one policy, an open cargo policy, will be issued by an insurance company to the insured. This one policy automatically covers all exposures of the insured which come within its terms.

[5]Circle Airfreight Japan, Ltd., is incorporated in the United States, but its principal place of business is in Japan.

income of the Harper affiliated group by treating as constructive dividends to Harper, CAC, and Harper Robinson the amount of insurance premiums which Harper's foreign subsidiaries[6] paid to Rampart (on the theory that the foreign subsidiaries were "merely instruments in Harper's overall self-insurance scheme from which Harper [CAC and Harper Robinson] received the primary benefit"), as follows:

|  | 1981 | 1982 | 1983 |
|---|---|---|---|
| Harper | $265,988 | $146,727 | $159,925 |
| CAC | 213,268 | 187,655 | 197,889 |
| Harper Robinson | 108,969 | 119,828 | 107,241 |

*Rampart*

In 1974, Harper's management decided to form an insurance subsidiary to provide substantially the same insurance coverage which Commercial Union had been supplying. To this end, Rampart was incorporated in March 1974. Rampart's insurance policies were closely modeled after the Commercial Union policy although liability limits provided by Rampart were higher. The Commercial Union policy was terminated in 1975.

Rampart complied with Hong Kong law governing the regulation of business corporations and insurance companies. It was duly authorized to carry on a marine insurance business in Hong Kong and was regulated by the Insurance Registry of Hong Kong.

---

[6]The amount of insurance premiums paid to Rampart by Harper's foreign subsidiaries (which respondent treated as constructive dividends to Harper, CAC, and Harper Robinson) were as follows:

| Foreign subsidiaries | Insurance premiums paid to Rampart | | |
|---|---|---|---|
|  | 1981 | 1982 | 1983 |
| WNFE | $97,015 | $115,114 | $94,135 |
| CAC-Taiwan | 23,760 | 23,760 | 23,760 |
| CAC-Singapore | 39,600 | 39,600 | 39,600 |
| CAC-Thailand | 1,800 | 1,800 | 1,800 |
| CAC-U.K. | 238,988 | 119,727 | 123,825 |
| CAC-South Africa | 15,000 | 1,500 | 15,000 |
| CAC-Germany | 18,000 | 1,800 | 18,000 |
| CAC-N.Z. | 5,613 | 7,150 | 5,298 |
| CAC-Canada | 27,000 | 27,000 | 27,000 |
| CAC-Australia | 102,009 | 97,319 | 88,097 |
| CAC-Philippines | 19,440 | 19,440 | 19,440 |
| CAC-Spain | --- | --- | 7,000 |
| CAC-Portugal | --- | --- | 2,100 |

The initial paid-in capital of Rampart was HK $200,000 (U.S. $40,000). In January 1981, the share capital of Rampart was increased to HK $5 million (U.S. $848,081) in compliance with a Hong Kong law requiring insurance companies to maintain minimum share capital in that amount.

Rampart maintained its own books of account, business records, bank accounts, and investments. Rampart shared facilities and employees with WFNE, and reimbursed WFNE therefor; otherwise, Rampart conducted its business in a manner consistent with its status as a separate corporation. Each year, it filed a profits tax return with the Hong Kong Inland Revenue Department.

The financial responsibility for the liabilities of Rampart's insurance business was borne solely by Rampart. Harper and its subsidiaries provided no guaranty, security, reinsurance, bond, or other financial arrangement with respect to Rampart's obligations.

### Rampart's Insurance Business

Rampart provided marine legal liability insurance to Harper's domestic and foreign subsidiaries as well as shipper's interest cargo insurance to customers of Harper Robinson and CAC. Each of Harper's subsidiaries (other than CAC and Harper Robinson) was billed monthly for the premiums due Rampart. The premium rates charged were determined by reference to competitive pricing and other relevant factors. Such rates were not determined by reference to actuarially determined loss projections. Information on competitive rates was gathered by the management of Harper and its subsidiaries in the course of their business and incorporated in the rates approved by Rampart.

Rampart provided marine cargo insurance to customers of Harper Robinson and CAC in two ways: (a) Through a CAC air waybill, covering CAC shipments only, and (b) through a special cargo policy covering individual air or ocean shipments. Harper management encouraged CAC and Harper Robinson to sell shipper's interest cargo insurance policies underwritten by Rampart. However, CAC and Harper Robinson had available for customers special cargo policies issued by two unrelated insurance companies. The percent-

ages of special cargo policies sold by CAC and Harper Robinson that were issued by Rampart were as follows:

1981 ............................................... 44%
1982 ............................................... 67%
1983 ............................................... 89%

During 1981-83, the air waybill insurance which Rampart provided to CAC's customers covered approximately 30,000 different shipments. The premiums Rampart earned from the sale of such air waybills insurance were as follows:

1981 ............................................... $415,108
1982 ............................................... 401,442
1983 ............................................... 356,773

The total number of special cargo policies issued by Rampart was 1,869 for 1981, 2,629 for 1982, and 2,224 for 1983. The premiums Rampart earned from the sale of such cargo policies were as follows:

1981 ............................................... $205,378
1982 ............................................... 271,785
1983 ............................................... 239,296

The insured values represented by special cargo policies were as follows:

| Year | No. of shipments under $50,000 | No. of shipments between $50,000-249,999 | No. of shipments between $250,000-499,999 | No. of shipments $500,000 or greater | Value of largest shipments |
|------|------|------|------|------|------|
| 1981 | 1,817 | 48 | 3 | 1 | $837,437 |
| 1982 | 2,547 | 76 | 5 | 1 | 523,354 |
| 1983 | 2,138 | 77 | 9 | - - - | 496,100 |

Customers purchasing Rampart insurance were unrelated to Harper and its subsidiaries. More than 7,500 customers purchased air waybill insurance or special cargo policies between 1981 and 1983. During each of these years, CAC served as a direct and indirect air carrier with respect to approximately 260,000 air shipments involving 18,000 air flights, and Harper Robinson handled approximately 40,000 ocean shipments involving 3,000 ocean voyages.

The amount of premium income from unrelated parties[7] and the percentage of total premium income which this

[7]See *infra* note 10.

amount comprised between 1974 and 1983 were as follows:

| Year | Gross premium revenue from unrelated parties | Total gross premium revenue | Percentage from unrelated parties |
|---|---|---|---|
| 1974 | $75,889 | $116,482 | 65% |
| 1975 | 41,712 | 477,371 | 72 |
| 1976 | 520,208 | 820,020 | 63 |
| 1977 | 620,490 | 972,350 | 64 |
| 1978 | 712,534 | 1,307,274 | 55 |
| 1979 | 726,724 | 1,596,795 | 45 |
| 1980 | 676,044 | 2,338,243 | 29 |
| 1981 | 671,621 | 2,283,371 | 29 |
| 1982 | 683,806 | 2,127,890 | 32 |
| 1983 | 610,320 | 1,837,948 | 33 |

All Harper subsidiaries, except CAC and Harper Robinson between 1978 and 1983, and WNFE for all years, were brother-sister corporations of Rampart.

The amount of premiums collected solely from brother-sister corporations, and the percentage of total premium income which this amount comprised between 1974 and 1983 were as follows:

| Year | Premium revenue from brother-sister corps. | Total gross premium revenue | Percentage from brother-sister corps. |
|---|---|---|---|
| 1974 | $34,126 | $116,482 | 29% |
| 1975 | 116,357 | 477,371 | 24 |
| 1976 | 206,930 | 820,020 | 25 |
| 1977 | 319,629 | 972,350 | 33 |
| 1978 | 59,623 | 1,307,274 | 5 |
| 1979 | 126,466 | 1,596,796 | 8 |
| 1980 | 740,772 | 2,338,243 | 32 |
| 1981 | 579,369 | 2,283,371 | 25 |
| 1982 | 472,233 | 2,127,890 | 22 |
| 1983 | 384,504 | 1,847,948 | 21 |

The amount of premium income from brother-sister corporations and unrelated parties, and the percentage of total premium income which this amount comprised between 1974 and 1983 were as follows:

| Year | Gross premium revenue from unrelated parties and brother-sister corps. | Total gross premium revenue | Percentage from brother-sister corps. |
|---|---|---|---|
| 1974 | $110,015 | $116,482 | 94% |
| 1975 | 458,069 | 477,371 | 96 |
| 1976 | 727,138 | 820,020 | 89 |
| 1977 | 940,119 | 972,350 | 97 |
| 1978 | 772,157 | 1,307,274 | 59 |
| 1979 | 853,190 | 1,596,795 | 53 |

| Year | Gross premium revenue from unrelated parties and brother-sister corps. | Total gross premium revenue | Percentage from brother-sister corps. |
|------|------|------|------|
| 1980 | 1,416,816 | 2,338,243 | 61 |
| 1981 | 1,250,990 | 2,283,371 | 55 |
| 1982 | 1,156,039 | 2,127,890 | 54 |
| 1983 | 994,824 | 1,847,948 | 54 |

Rampart provided for the possibility of large losses in two ways: it maintained substantial reserves and capital, and obtained partial reinsurance. Rampart obtained reinsurance through CT Bowring & Co. with Lloyd's Underwriters. A single reinsurance policy covered Rampart's insurance of customers and the Harper subsidiaries. The reinsurance policy included a $10,000 deductible for "each and every loss, casualty or disaster" and a liability limit of $4.0 million for any one conveyance.

Rampart's insurance reserves and capital for 1974 through 1983 as reported in its financial statements were as follows:

| Year | Reserve for unexpired risks | General reserve | Profit and loss account | Capital |
|------|------|------|------|------|
| 1974 | $64,065 | $24,747 | $2,443 | $40,000 |
| 1975 | 235,894 | 163,845 | 11,788 | 40,000 |
| 1976 | 420,283 | 428,006 | 29,557 | 40,000 |
| 1977 | 621,597 | 887,821 | 99,929 | 40,000 |
| 1978 | 1,097,597 | 1,548,285 | 256,643 | 40,000 |
| 1979 | 1,510,943 | 2,073,830 | 646,648 | 40,000 |
| 1980 | 2,307,312 | 2,073,830 | 2,270,383 | 40,000 |
| 1981 | 2,904,092 | 2,073,830 | 3,803,220 | 848,081 |
| 1982 | 3,389,607 | 2,073,830 | 6,185,261 | 848,081 |
| 1983 | 3,054,971 | 2,073,830 | 9,113,942 | 848,081 |

The total claims asserted against Rampart during 1981, 1982, and 1983 were approximately as follows:

| Year | Estimated claims asserted |
|------|------|
| 1981 | $350,000 |
| 1982 | 650,000 |
| 1983 | 800,000 |

Rampart paid claims in accordance with the open cargo policies issued to Harper's domestic and foreign subsidiaries. Of the claims asserted each year, some were paid in full, some were paid in part, and some were denied due to untimeliness or other reasons. Of the claims paid, some amounts related to claims asserted in prior years. During

1981, 1982, and 1983, the amounts Rampart paid in claims were as follows:

| Year | Claims paid |
|---|---|
| 1981 | $207,084 |
| 1982 | 180,724 |
| 1983 | 266,419 |

The proportion of customer insurance claims paid by Rampart in 1981, 1982, and 1983 was approximately the same as the proportion of premiums derived from customer insurance as follows:

| Year | Claims paid | Customer air waybill claims paid | Customer special cargo claims paid | Customer claims paid percentage | Customer premium percentage |
|---|---|---|---|---|---|
| 1981 | $207,084 | $37,735 | $45,776.80 | 40% | 29% |
| 1982 | 180,724 | 52,054 | 4,153.88 | 31 | 32 |
| 1983 | 266,419 | 21,566 | 46,146.83 | 25 | 33 |

The total dollar amounts of risk which Rampart insured during 1981-83, including insurance issued to Harper's subsidiaries and to customers, were as follows:

| Year | Value insured |
|---|---|
| 1981 | $535,013,599 |
| 1982 | 528,122,405 |
| 1983 | 496,180,399 |

*Expert Testimony*

Each side presented the testimony of two experts; all the experts possessed superlative credentials. Petitioners presented the testimony of Mr. Joseph DeVito and Dr. Neil A. Doherty. Prior to his retirement, Mr. DeVito had 38 years of experience in the marine insurance industry and was senior vice president of Frenkel & Co., Inc., one of the larger insurance brokerage companies in the United States and one of the ten largest marine insurance brokers. Mr. DeVito explained that marine insurance rates are not established in accordance with actuarial projections or standard rates but rather are determined by competitive market forces, taking into account such factors as the type of coverage, amount of the deductible, liability limits, types of cargo, and insured's history of loss. Mr. DeVito evaluated the rates charged by Rampart and determined that they were reasonable and competitive.

Dr. Doherty is a Professor of Insurance at the Wharton School, University of Pennsylvania. His Ph.D. degree is in economics. He has published several books on insurance and has authored numerous insurance articles appearing in professional and academic journals. Dr. Doherty stated that risk shifting (or transfer) and risk distribution (or pooling) are not independent and unrelated concepts. Under his view, through the premium pooling process, related and unrelated insureds transfer their risk into a common pool securing the benefit of risk reduction. Dr. Doherty opined that in the instant case both the unrelated and related parties acquired insurance from Rampart since risk transfer and distribution occurred.

Dr. Doherty prepared several calculations in an attempt to quantify the reduced risk resulting from the addition of premiums from unrelated insureds. He concluded that Rampart's risk would be 23.8 percent lower when it had 30 percent of premiums from unrelated insureds and 27.9 percent lower when the percentage of such premiums was 40 percent. In his view, these reductions in risk were significant.

Respondent presented the testimony of Dr. Irving Plotkin and Mr. Richard Stewart. Dr. Plotkin, a vice president of Arthur D. Little, Inc., holds a Ph.D. degree in mathematical economics. Dr. Plotkin testified that a wholly owned captive insurance company cannot insure the risks of its parent and affiliated corporations because risk transfer does not occur. Dr. Plotkin further testified that, in the context of a wholly owned insurance subsidiary, this result would remain the same irrespective of the amount of unrelated third party risks which the captive insurance company insured.

Dr. Plotkin testified that Dr. Doherty's calculations were flawed. According to Dr. Plotkin, the unrelated party risks which Rampart insured were not statistically independent, as assumed by Dr. Doherty, but rather were highly correlated.[8] Due to this high degree of correlation, the reduction in risk to Rampart would be far less than Dr. Doherty's calculations suggest.

---

[8] In simple terms, two insured risks are correlated if they are triggered by the same event or peril. Here, for example, the related and unrelated insured each procured insurance to cover loss or damage to the unrelated insured's cargo. These risks are correlated because the same event, i.e., loss at sea, would trigger both the related and unrelated insureds' risks.

Dr. Plotkin opined that while the addition of unrelated third party risks improves the predictability of the average loss that a captive insurance company would incur, the improved predictability is irrelevant for determining whether risk transfer exists, although it does assist in setting premium levels. He maintained that the added third party risks actually increase the risk of ruin or insolvency of the captive insurance company, a result which, in his view, negates the existence of insurance with respect to the related insureds.

Mr. Stewart is the founder of Stewart Economics, Inc., a consulting firm specializing in insurance. He is a former superintendent of insurance for the State of New York. Mr. Stewart opined that risk transfer is a necessary condition for the presence of insurance. He further opined that when the Harper subsidiaries paid premiums to Rampart, the related insureds did not transfer their risk. Mr. Stewart claimed that the prevailing view in the insurance business is that a wholly owned insurance company is a risk retention device with respect to its owner and affiliates regardless of whether the insurance company accepts business from unrelated third parties.

## OPINION

At the outset, we address respondent's contention that we are bound to follow the holding in *Clougherty Packing Co. v. Commissioner*, 811 F.2d 1297 (9th Cir. 1987), affg. 84 T.C. 948 (1985), because an appeal of this case lies with the Court of Appeals for the Ninth Circuit. See *Golsen v. Commissioner*, 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971). In *Clougherty Packing Co. v. Commissioner, supra,* the Ninth Circuit's analysis was premised on the fact that the captive insurer insured only the risks of its grandparent corporation (i.e., the parent of the parent of the captive insurance company). *Clougherty Packing Co. v. Commissioner,* 811 F.2d at 1305. Here, Rampart insured unrelated parties as well as affiliated corporations. *Clougherty Packing Co. v. Commissioner, supra,* is not squarely on point; accordingly, we are not bound to apply the result reached therein.

Insurance involves both risk shifting and risk distribution, i.e., the sharing and distribution of the insurance risk by all persons insured is essential to the concept of insurance. *Helvering v. LeGierse*, 312 U.S. 531, 539 (1941). Relying on a theory first articulated in Rev. Rul. 77-316, 1977-2 C.B. 53, respondent posits that a corporation, its subsidiaries and affiliates constitute but a single economic unit, and thus respondent reasons, risk cannot be transferred to an insurer which is a member of the insured's "economic family" since the entities which bear the ultimate economic burden of loss are the same entities which suffer the loss. Petitioners, not surprisingly, disagree. We have repeatedly rejected respondent's economic family theory. See *AMERCO & Subsidiaries and Republic Western Insurance Co. v. Commissioner*, 96 T.C. at 41 ; *Sears, Roebuck & Co. and Affiliated Corps. v. Commissioner*, 96 T.C. 61 (1991); *Gulf Oil Corp. v. Commissioner*, 89 T.C. at 1024; and *Humana, Inc. v. Commissioner*, 88 T.C. at 214. Again, we do so herein.

The term "insurance" is not defined in the Internal Revenue Code. Dr. Doherty and Dr. Plotkin defined insurance somewhat differently, but both agreed that insurance is an arrangement or device which must be examined from the perspective of both the insured and the insurer. From the insured's perspective, insurance is protection from financial loss provided by the insurer upon payment of a premium, i.e., it is a risk-transfer device. From the insurer's perspective, insurance is the pooling of a large number of similar risks of a group of insureds out of which pecuniary benefits for a fortuitous loss to any insured member are paid, i.e., it is a risk-distribution device.

In our opinion, the tax treatment of an alleged insurance payment by a parent or affiliated company to a captive insurance company is to be governed by (1) the facts and circumstances of the particular case, and (2) principles of Federal taxation, rather than economic and risk management theories.[9] We reject the proposition (from a tax viewpoint) advocated by Dr. Plotkin that a parent corpora-

---

[9]Under the well-recognized doctrine of corporate separateness, the separate identity of a corporation is to be respected for tax purposes unless the corporation is a sham. *Moline Properties v. Commissioner*, 319 U.S. 436 (1943).

tion can never obtain insurance from an insurance company subsidiary. We further reject the proposition (again, from a tax viewpoint) that the presence of unrelated insureds has no relevance in determining whether a transaction between a wholly owned insurance company and its owner and affiliates constitutes insurance.

In determining the propriety of claimed insurance deductions by a parent or affiliated company to a captive insurance company, the following 3-prong test must be applied, and each part must be satisfied:

(1) Whether the arrangement involves the existence of an "insurance risk";

(2) whether there was both risk shifting and risk distribution; and

(3) whether the arrangement was for "insurance" in its commonly accepted sense.

See *AMERCO & Subsidiaries and Republic Western Insurance Co. v. Commissioner,* 96 T.C. at 38.

### (1) *Existence of Insured Risk*

As we articulated in *AMERCO & Subsidiaries and Republic Western Insurance Co. v. Commissioner,* 96 T.C. at 38-39:

Basic to any insurance transaction must be risk. An insured faces some hazard; an insurer accepts a premium and agrees to perform some act if or when the loss event occurs. If no risk exists, then insurance cannot be present.

See *Helvering v. LeGierse,* 312 U.S. 531, 539 (1941).

In the course of their international air and ocean freight forwarding businesses, the various subsidiaries of Harper faced substantial potential liability which was transferred to Rampart upon payment of a premium. The transfer of risk to Rampart, as well as its exposure, was real, not illusory. Thus, in this case, an insurance risk existed.

### (2) *Risk Shifting and Risk Distribution*

In *Helvering v. LeGierse, supra,* the Supreme Court observed that "Historically and commonly insurance involves risk-shifting and risk-distributing." 312 U.S. at 539. " 'Risk-shifting' means one party shifts his risk of loss to

another, and 'risk-distributing' means that the party assuming the risk distributes his potential liability, in part, among others." *Beech Aircraft Corp. v. United States,* 797 F.2d 920, 922 (10th Cir. 1986). Absent risk distribution, there is no pool of insurance to which risk can be transferred. In our opinion, in the captive insurance company arena, given a sufficient number of unrelated insureds, risk can be transferred from an owner-insured to the captive insurer.

Dr. Doherty opined that risk transfer and risk distribution are two sides of the same coin which as an integrated whole constitute "insurance." He further opined that premiums are fungible and indivisible and once premiums are pooled together, the payor's identity (i.e., the insured) is lost. According to Dr. Doherty, "it is the combination of the premiums that pay total loss, and that's the essence of the pool or risk distribution process." We agree with Dr. Doherty's assessment.

Here, risk-shifting occurred—insurance contracts were written, and premiums, as well as claims for losses, were paid. Rampart was a corporation whose existence was separate from that of Harper, CAC, and Harper Robinson. Rampart was not a sham; it conducted a bona fide insurance business and was regulated as an insurance company under the laws of Hong Kong. Indeed, it was stipulated that neither section 269 nor the separate existence of Rampart as a corporation for income tax purposes is an issue in this case. It was further stipulated that the premiums paid to Rampart by the Harper subsidiaries were negotiated at arm's length. Rampart not only was financially capable of satisfying claims made against it, but it in fact paid such claims.

Here, risk distribution also occurred. In *AMERCO & Subsidiaries and Republic Western Insurance Co. v. Commissioner, supra,* we held that where unrelated insureds comprise over 50 percent of a captive insurance company's business, there was risk distribution; in *Gulf Oil Corp. v. Commissioner, supra,* we held that where less than 2 percent of a captive insurance company's business comes from unrelated insureds, there was no risk distribution. Here, the relatively large number of unrelated insureds

comprise approximately 30 percent of Rampart's business;[10] such a level of unrelated insureds, in our opinion, constitutes a sufficient pool of insureds to provide risk distribution.

### (3) *Insurance in its Commonly Accepted Sense*

Rampart was both organized and operated as an insurance company. It was regulated by the Insurance Registry of Hong Kong. The adequacy of Rampart's capitalization is not in dispute. The premiums charged by Rampart to its affiliates, as well as to its shippers, were the result of arm's-length transactions. The policies issued by Rampart were valid and binding. In sum, such policies were insurance policies, and the arrangements between the Harper domestic subsidiaries and Rampart constituted insurance, in the commonly accepted sense.

### *Holding*

We conclude that for Federal income tax purposes the payments by Harper's domestic subsidiaries to Rampart were in form, as well as in substance, insurance payments. Such payments were not the equivalent of a self-insurance reserve. Accordingly, they are deductible.

We further conclude that the insurance premiums paid by Harper's foreign affiliates to Rampart were in fact for insurance and thus do not constitute constructive dividends to Harper, CAC, and Harper Robinson.

---

[10]In *Humana Inc. v. Commissioner,* 88 T.C. 197, (1987), we denied deductions for payments styled as insurance premiums made by a parent corporation as well brother-sister corporations, to a captive insurance company. All of the insureds in *Humana* were related to the captive insurer. The Sixth Circuit Court of Appeals affirmed the disallowance with respect to the parent corporation but allowed deductions for the payments made by the brother-sister corporations. Unlike the situation in *Humana,* here Rampart issued policies to unrelated entities. In determining whether the captive insurance arrangement involved risk distribution, we deem it apposite to consider the percentage of gross premium income received by the captive insurer from unrelated insureds. See *AMERCO & Subsidiaries and Republic Western Insurance Co. v. Commissioner,* 96 T.C. 18 (1991). If brother-sister corporations are considered unrelated parties, then in the instant case the percentage of gross premium income received by Rampart from unrelated parties for the years in issue would be greater than 50 percent. If brother-sister corporations are considered related parties, then the percentage of such income for the relevant years would approximate 30 percent. For purposes of this case, we need not consider whether brother-sister corporations are to be characterized as unrelated parties for we believe that when 30 percent of the captive insurer's income is received from a relatively large number of unrelated insureds, there is a sufficient pool for the occurrence of risk distribution.

To reflect the foregoing and concessions of the parties,

*Decision will be entered under Rule 155.*

Reviewed by the Court.
NIMS, KÖRNER, SHIELDS, HAMBLEN, COHEN, SWIFT, GERBER, WRIGHT, PARR, COLVIN, and HALPERN, *JJ.,* agree with the majority.
WELLS and RUWE, *JJ.,* did not participate in the consideration of this opinion.

---

WHALEN, *J.,* dissenting: I respectfully dissent from the majority opinion of this case for the reasons stated in the "payments to insurance company subsidiary" segment of my dissenting opinion in *Sears, Roebuck & Co. and Affiliated Corps. v. Commissioner,* 96 T.C. 61 (1991), docket No. 2165-89, released today.
CHABOT and PARKER *JJ.,* agree with this dissent.