T.C. Memo. 2014-225

UNITED STATES TAX COURT

SECURITAS HOLDINGS, INC. AND SUBSIDIARIES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 21206-10.                      Filed October 29, 2014.

<u>Michael Francis Kelleher</u>, <u>Elizabeth A. Erickson</u>, and <u>Justin E. Jesse</u>, for petitioner.

<u>Henry C. Bonney, Jr.</u>, and <u>Lloyd T. Silberzweig</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

BUCH, <u>Judge</u>:  Respondent issued a notice of deficiency determining deficiencies of $13,801,906 for 2003 and $16,496,539 for 2004.  The deficiencies largely stem from respondent's partial disallowance of deductions for interest expenses and deductions for insurance expenses related to a captive insurance

[*2] arrangement. The sole issue remaining for us to decide is whether petitioner

is entitled to deduct premiums paid through the captive insurance arrangement

established by its parent corporation. Respondent does not dispute that the

arrangement involved insurable risks, and we hold that the captive arrangement

shifted risks, distributed risks, and constituted insurance in the commonly

accepted sense. Therefore, the arrangement is insurance for Federal tax purposes,

and petitioner is entitled to the deduction under section 162[1] for insurance

expenses.

## FINDINGS OF FACT

### I. Parent-Subsidiary Structure

Securitas AB is a public Swedish company. Beginning in the late 1980s and

continuing through the 1990s Securitas AB expanded its business outside of

Sweden by acquiring other companies throughout Europe. Securitas AB first

entered the U.S. security services market in 1999 when it established Securitas

Holdings, Inc. (SHI). SHI is the parent company of an affiliated group of U.S.

corporations (SHI Group or petitioner). During 2003 and 2004, the years in issue,

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar.

[*3] SHI had no employees, owned no vehicles, and did not provide any security services itself. The SHI Group used the accrual method of accounting throughout the years in issue.

In 1999 SHI acquired Pinkerton's, Inc. (Pinkerton's), a Delaware corporation, and its subsidiaries. Before its acquisition Pinkerton's was a publicly traded company that provided various security services and had approximately 48,000 employees in over 250 offices worldwide. In 2000 and 2001 SHI acquired several additional security companies, including Burns International Services Corp. (Burns), also a Delaware corporation, and its subsidiaries. Like Pinkerton's, Burns was a publicly traded company that provided various security services and had approximately 75,000 employees in 300 offices in North America, South America, and Europe.

According to Securitas AB's 2003 annual report, Securitas AB and its subsidiaries (Securitas AB Group) accounted for 8% of the total world market for security services. During 2003 and 2004 the Securitas AB Group employed over 200,000 people in 20 countries, mostly in North America and Europe.

II. Services

In 2003 and 2004 the Securitas AB Group and the SHI Group provided guarding services, alarm systems services, and cash handling services.

**[*4]**  Guarding services include providing uniformed security officers to maintain a secure environment for clients as well as consulting and investigation services. In 2003 and 2004 the SHI subsidiaries providing guarding services had approximately 101,080 and 91,170 employees, respectively.  These subsidiaries also operated 2,250 and 2,495 vehicles, respectively.  In mid-2003 many of the SHI subsidiaries providing guarding services were consolidated into a newly formed corporation and subsidiary of SHI, Securitas Security Services USA, Inc. (SSUSA).

Alarm systems services include the installation of alarm systems and alarm-to-response solutions.  Pinkerton's Systems Integration, Inc., an SHI subsidiary, provided alarm systems services.  This company was later renamed Securitas Security Systems USA, Inc., and employed approximately 270 people during 2003 and 2004.

Cash handling services include cash transport, cash processing, and ATM services.  Loomis, Fargo & Co. (Loomis), an SHI subsidiary, provided cash handling services and had approximately 7,122 employees in 2003 and 7,481 employees in 2004.

[*5] III. <u>Protectors</u>

Protectors Insurance Co. of Vermont (Protectors) was incorporated in Vermont in 1986 as a licensed captive insurance company. As a result of various acquisitions, the SHI Group acquired Protectors in early 2000, and Protectors became a direct, wholly owned subsidiary of SHI in January 2003. Between November 1, 1996, and December 30, 2002, Protectors did not write new or renewal coverage, and its operations consisted solely of the runoff of previously written coverage.

Protectors had no employees during 2003 and 2004. Protectors maintained separate books and records, maintained a separate bank account for its operations, prepared financial statements, and held annual meetings of its board of directors. Throughout 2003 and 2004 none of the U.S. operating subsidiaries of SHI or the non-U.S. operating subsidiaries of Securitas AB owned any interest in Protectors, and it was managed by a company that was unrelated by ownership to SHI.

During 2003 and 2004 Protectors was subject to regulation as a captive insurance company in the State of Vermont and paid premium taxes to the State of Vermont. In June 2003 Protectors requested permission from the Vermont Department of Banking, Insurance, Securities & Health Care Administration (Vermont regulators) to lend all but $1 million of its capital to SHI. The Vermont

[*6] regulators approved this request. Further, in early 2004 the Vermont regulators allowed the SHI Group to avoid contributing additional capital to Protectors as a result of Protectors' issuing an insurance policy for 2004 to Loomis. The Vermont regulators also waived the premium taxes with respect to the policy.

IV.  Securitas Group Reinsurance Limited

In late 2002 Securitas AB informed the Irish Department of Enterprise, Trade, and Employment that it intended to establish a new captive reinsurance company in Ireland called Securitas Group Reinsurance Ltd. (SGRL) and that it intended SGRL to be fully operational before the end of 2002. The Irish authorities responded that they had no objection, and SGRL was incorporated under the laws of Ireland.

Beginning in December 2002 and continuing through 2004, SGRL operated as a wholly owned subsidiary of Securitas AB, and it was subject to regulation as a reinsurance company in Ireland. SGRL's total shareholders' funds were $51,456,000 at the end of 2003 and $77,497,000 at the end of 2004. During 2003 and 2004 none of the U.S. operating subsidiaries of SHI and none of the non-U.S. operating subsidiaries of Securitas AB owned any interest in SGRL. SGRL maintained separate books and records, maintained a separate bank account for its

[*7] operations, prepared financial statements, and held meetings of its board of directors.

V.  Implementation of the Captive Insurance Program

After wages, the cost of risk is the second largest cost for the Securitas AB Group.  The operating subsidiaries of the SHI Group had exposure to various insurable risks, including:  workers' compensation, automobile, employment practices, general, and fidelity liabilities.  In 2002, 2003, and 2004 the SHI Group obtained insurance coverage from third-party insurers.  These third-party policies had deductibles or self-insured retentions which were the responsibility of the SHI Group subsidiaries.

Several events converged in the early 2000s causing the insurance market to harden and causing insurance rates to increase.  In response to the increase, the Securitas AB Group tried to control risks and to obtain more favorable insurance rates.  As part of this effort, the Securitas AB Group decided to implement a captive insurance program to insure the risks within the deductible layers of the existing third-party policies.  A captive insurance program was attractive to the Securitas AB Group for a variety of reasons, including that the cost of adopting the program was less than the cost of reducing deductibles and purchasing insurance from third parties.  The captive program also allowed Securitas AB to

[*8] centralize risks. Further, it allowed the subsidiaries to know their cost of risk in advance. In the years since its implementation, the captive insurance program has provided more cost-effective insurance coverage than would have otherwise been available.

It was part of the implementation that Securitas AB formed SGRL in 2002. Because SGRL was a reinsurance company and could not issue policies directly, Protectors provided insurance for U.S. subsidiaries, and XL Insurance Co. Ltd. (XL Insurance), a United Kingdom company, provided insurance to the non-U.S. subsidiaries.

VI. Insurance Coverages for U.S. Subsidiaries

In December 2002 Protectors issued a loss portfolio transfer policy to SHI to cover the unresolved or unreported losses for the insurable risks of most of the SHI Group's operating subsidiaries up to the deductibles or self-insured retentions of the third-party policies. Protectors also issued a similar policy to Loomis in December 2003.

For 2003 Protectors issued prospective insurance policies to cover the insurable risks of most of the SHI Group's operating subsidiaries up to the deductible or self-insured retentions of the third-party policies. For 2004 Protectors issued similar policies except that the policies each had a $15,000

[*9] deductible, making the subsidiaries responsible for losses up to that amount. The insurance policies identified the insured, contained an effective period, specified the covered risks, identified a premium amount, and were signed by an authorized representative.[2]

A. Parental Guaranty

In 2000 the SHI Group acquired Centaur Insurance Co. (Centaur) as part of the larger acquisition of Burns. Centaur is an Illinois insurance company that had been in rehabilitation proceedings since 1987. Centaur has claimed to be tax exempt under section 501(c)(15) since 1990 because it has received no premium income.

While preparing to implement the captive insurance program, the SHI Group learned that reactivation of Protectors could adversely affect Centaur's tax-exempt status. The premium test under section 501(c)(15) limits the amount of premiums that can make up gross receipts for an insurance company that seeks tax-exempt status. The premium test is applied on a controlled group basis, and Protectors and Centaur were part of the same controlled group during 2002, 2003, and 2004.

---

[2]Some of the policies were signed after the policy's effective date. There is no explanation for this in the record, and neither party argues that this renders the policies ineffective.

[*10] In late 2002 the SHI Group considered selling Centaur's stock to a non-U.S. affiliated company in order to remove Centaur from the U.S. controlled group. In early December 2002 the SHI Group chose to have SHI execute a parental guaranty guaranteeing the performance of Protectors, as opposed to selling Centaur's stock. Before the end of 2002 SHI executed a parental guaranty guaranteeing the performance of Protectors with respect to the 2002 loss portfolio transfer policy written by Protectors to the SHI Group's subsidiaries. SHI also executed an amended and restated guaranty guaranteeing the performance of Protectors with respect to any and all agreements that were effective on or after November 25, 2002, that were issued by Protectors regarding risks retained by the SHI Group's operating subsidiaries. The amended and restated guaranty replaced the first guaranty. The amended and restated guaranty was in effect during 2003 and 2004. As a result of the amended and restated guaranty, it was the SHI Group's position that Protectors did not qualify as an insurance company for Federal income tax purposes during 2002, 2003, and 2004. The intended effect of this position was to remove Protectors from the premium test under section 501(c)(15) and, by extension, to preserve Centaur's tax-exempt status. There is no evidence in the record to suggest that any amount was ever paid out under the guaranty.

**[*11]** In 2003 the SHI Group continued to pursue the possibility of selling Centaur's stock. However, the SHI Group did not sell the stock during 2003 or 2004.

### B. Reinsurance

All of the insurable risks covered under the two loss protection policies and the prospective insurance policies were reinsured with SGRL. In 2003 SGRL received premiums from over 25 separate entities. In 2004 SGRL received premiums from over 45 separate entities. Like the policies that Protectors issued, the reinsurance policies identified the insured, contained an effective period, specified the covered risks, identified a premium amount, and were signed by an authorized representative.[3]

No guaranty was ever provided to SGRL by any party for any of the risks reinsured under the agreement with Protectors. Additionally, neither the insurance policies that Protectors issued nor the policies that SGRL issued contained a cut-through provision that would allow the insured the right to seek claims payment directly from the reinsurer on the primary insurer's failure to meet its obligations fully or on time.

---

[3]Again, some of the policies were signed after the policy's effective date. There is no explanation for this in the record, and neither party argues that this renders the policies ineffective.

[*12] C. Premiums to SHI Group Subsidiaries

During the years in issue outside actuaries reviewed the premiums and determined they were reasonable.[4] From January to July 1, 2003, Pinkerton's paid the 2003 premiums on behalf of the other SHI Group subsidiaries. From July 1, 2003, to the end of 2003, after the merger of many of the subsidiaries into SSUSA, SSUSA paid the premiums on behalf of the other SHI Group subsidiaries. Pinkerton's, and later SSUSA, recorded general ledger accounts payable to SGRL for the amounts of the premiums. These accounts payable were booked pro rata on a monthly basis, except for the one for the first quarter of 2003, which was booked at the end of March. Pinkerton's and SSUSA paid claims that were covered under the Protectors policies and recorded general ledger accounts receivable from SGRL for those amounts. Pinkerton's and SSUSA also paid administrative fees relating to the Protectors policies and recorded general ledger accounts receivable from SGRL for those amounts. These amounts were reversed that same year when it was determined that administrative fees had not been taken into account when setting the premiums. In July and August 2003 the excess of the accounts payable over the accounts receivable was paid by wire transfer from Pinkerton's/SSUSA to Protectors. Protectors then paid that amount to SGRL,

---

[4]Respondent does not challenge the reasonableness of the premiums.

**[*13]** minus a $225,000 ceding commission that Protectors retained. Of the 2003 premiums, $56,242,080 was paid and deducted for Federal income tax purposes in 2003 and $5,144,918 was paid and deducted for Federal income tax purposes in 2004.

The $16 million premium for the 2003 Protectors policy insuring Loomis was paid to Protectors in 2003 by Loomis. Protectors then paid that amount to SGRL, minus a $50,000 ceding commission.

During 2003 SSUSA allocated the premiums among the subsidiaries as follows:

[*14]

| Entity | Petitioner's premium allocation per entity | Each entity's percentage of the total premium payable to Protectors |
|---|---|---|
| Pinkerton's | $8,658,886 | 11.189 |
| Pinkerton Management | 2,204 | .003 |
| Guardian Uniforms | 254,446 | .329 |
| Renaissance Center | 131,956 | .171 |
| Pinkerton Protection Svcs | 242,031 | .313 |
| Pinkerton Government Svcs | 2,617,868 | 3.382 |
| Burns | 19,489,689 | 25.185 |
| Burns International Security Services of Florida | 1,279,162 | 1.653 |
| Hall Security | 65,706 | .085 |
| SSUSA | 28,645,052 | 37.015 |
| Loomis | 16,000,000 | 20.675 |
| Total | 77,387,000 | |

SSUSA paid the 2004 premiums in a similar manner. SSUSA paid the premiums on behalf of the other subsidiaries and recorded general ledger accounts payable to SGRL. The accounts payable were booked pro rata on a monthly basis. Throughout the year SSUSA paid claims and administrative fees that were covered by the policies and recorded general ledger accounts receivable for those amounts.

**[*15]** Again, the accounts receivable were booked pro rata on a monthly basis. In July, October, and December 2004 the excess of the accounts payable over the accounts receivable was paid by wire transfer from SSUSA to Protectors. Protectors then paid the amount to SGRL, minus a $225,000 ceding commission that Protectors retained. Of the 2004 premiums, $51,592,517 was paid and deducted for Federal income tax purposes in 2004 and $1,132,573 was paid and deducted for Federal income tax purposes in 2005.

The $4,258,100 premium for the 2004 Protectors policy insuring Loomis was paid to Protectors in 2004 by Loomis. Protectors then paid this amount over to SGRL, minus a $25,000 ceding commission.

During 2004 the premiums were allocated among the subsidiaries as follows:

| Entity | Petitioner's premium allocation per entity | Each entity's percentage of the total premium payable to Protectors |
|---|---|---|
| SSUSA | $50,342,514 | 88.346 |
| Renaissance Center | 85,112 | .149 |
| Pinkerton Government Svcs | 2,297,464 | 4.032 |
| Loomis | 4,258,100 | 7.472 |
| Total | 56,983,190 | |

[*16] VII.  Insurance Coverages for Non-U.S. Subsidiaries

During 2003 and 2004 XL Insurance Co. Ltd. (XL Insurance) issued insurance policies to cover general liability insurance risks for the non-U.S. subsidiaries of Securitas AB.  XL Insurance was unrelated by ownership to the entities in the Securitas AB Group.  Like the Protectors policies, the XL Insurance policies provided only the first layer of coverage.  In 2003 and 2004 XL Insurance reinsured a portion of its risk under the insurance policies with SGRL.  The premiums for the 2003 and 2004 reinsurance agreements totaled $9,103,733, which XL Insurance paid to SGRL.  During these years no subsidiary was allocated more than 50% of the premiums.

VIII.  Notice of Deficiency

On July 1, 2010, the IRS issued a notice of deficiency to the SHI Group for its 2003 and 2004 taxable years.  In the notice the IRS disallowed portions of the SHI Group's deductions for interest expenses and insurance premiums and made other computational adjustments.  The adjustments resulted in tax increases of $13,801,906 for 2003 and $16,496,539 for 2004.

Because the parties stipulated the interest expense deductions, the only issue remaining is whether the SHI Group is entitled to deduct insurance premiums paid.  Of the $72,242,080 deduction amount claimed on its 2003 return, the IRS

[*17] disallowed deductions of $47,729,741 and allowed deductions of $24,512,339. The amount allowed consists of $8,512,339 in actual paid claims and expenses and the $16 million premium paid for the Loomis loss protection policy.[5] Of the $61,394,596 deduction amount claimed on its 2004 return, the IRS disallowed deductions of $41,270,724 and allowed deductions of $20,123,872. The amount allowed consists of $15,466,711 in actual paid claims and expenses and $4,657,161 in premiums that Loomis paid.

The SHI Group, while maintaining its principal place of business in California, timely petitioned.

OPINION

I. Insurance Premium Deduction

Section 162(a) permits a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". Insurance premiums may be deductible business expenses.[6] Although insurance premiums may be deductible, amounts placed in reserve as self-

---

[5] Although the insurance transaction involving Loomis appears strikingly similar to the transaction involving the rest of the SHI Group subsidiaries, respondent could provide no explanation at trial regarding why the premiums paid by Loomis were allowed and the other premiums were not.

[6] Sec. 1.162-1(a), Income Tax Regs.

[*18] insurance are not.[7] Such amounts can be deducted only at the time that the loss for which the reserve was established is actually incurred.[8]

Neither the Code nor the regulations define "insurance". However, the Supreme Court has stated that "[h]istorically and commonly insurance involves risk-shifting and risk-distributing."[9] Over time, courts have looked primarily to four criteria in deciding whether an arrangement constitutes insurance for Federal income tax purposes: (1) the arrangement must involve insurable risks; (2) the arrangement must shift the risk of loss to the insurer; (3) the insurer must distribute the risks among its policyholders; and (4) the arrangement must be insurance in the commonly accepted sense.[10] Although these criteria are not independent or exclusive, they establish a framework for determining whether insurance exists under the Federal tax law.[11]

---

[7]Steere Tank Lines, Inc. v. United States, 577 F.2d 279, 280 (5th Cir. 1978); Spring Canyon Coal Co. v. Commissioner, 43 F.2d 78, 80 (10th Cir. 1930), aff'g 13 B.T.A. 189 (1928).

[8]United States v. General Dynamics Corp., 481 U.S. 239, 243-245 (1987).

[9]Helvering v. Le Gierse, 312 U.S. 531, 539 (1941).

[10]Harper Grp. v. Commissioner, 96 T.C. 45, 58 (1991), aff'd, 979 F.2d 1341 (9th Cir. 1992); AMERCO v. Commissioner, 96 T.C. 18, 38 (1991), aff'd, 979 F.2d 162 (9th Cir. 1992).

[11]AMERCO v. Commissioner, 96 T.C. at 38.

[*19] Respondent does not dispute that the arrangement here involved insurable risks.

### A. Risk Shifting

In order for an arrangement to be considered insurance, it must shift risk of loss from the insured to the insurer.[12] "From the insured's perspective, insurance is protection from financial loss provided by the insurer upon payment of a premium, i.e., it is a risk-transfer device."[13] Risk shifting transfers the threat of an economic loss from the insured to the insurer because "[i]f the insured has shifted its risk to the insurer, then a loss by or a claim against the insured does not affect it because the loss is offset by the proceeds of an insurance payment."[14] When evaluating whether risk shifting occurred, we consider separate but related insurance contracts, such as insurance and reinsurance, together.[15]

In brother-sister corporation arrangements, such as the arrangement before us, we look to what has become known as the balance sheet and net worth analysis

---

[12]Clougherty Packing Co. v. Commissioner, 811 F.2d 1297, 1300 (9th Cir. 1987), aff'g 84 T.C. 948 (1985).

[13]Harper Grp. v. Commissioner, 96 T.C. at 57.

[14]Clougherty Packing Co. v. Commissioner, 811 F.2d at 1300.

[15]Helvering v. Le Gierse, 312 U.S. at 540-542; Carnation Co. v. Commissioner, 71 T.C. 400, 408-409 (1978), aff'd, 640 F.2d 1010 (9th Cir. 1981).

[*20] to determine whether risk has been shifted.[16] Under the balance sheet and net worth analysis, we examine the economic consequences of the captive insurance arrangement to determine whether the insured party has shifted the risk.[17] In doing so, we look only at the insured's assets to determine whether the insured "divested itself of the adverse economic consequences" of a claim covered by the insurance policy.[18] Additionally, we generally afford related corporate entities separate tax status and treatment.[19]

Respondent argues that the guaranty from SHI to Protectors prevents risk from shifting from the SHI Group subsidiaries to SGRL because SHI bore the ultimate risk of loss. In making this argument, respondent relies on three cases, Malone & Hyde, Inc. v. Commissioner, 62 F.3d 835 (6th Cir. 1995), rev'g T.C. Memo. 1993-585, Kidde Indus., Inc. v. United States, 40 Fed. Cl. 42 (1997), and Hospital Corp. of Am. v. Commissioner, T.C. Memo. 1997-482. We recently addressed Malone & Hyde and Kidde in the opinion of the Court and the

---

[16]Rent-A-Center, Inc. v. Commissioner, 142 T.C. ___, ___ (slip op. at 33) (Jan. 14, 2014).

[17]Clougherty Packing Co. v. Commissioner, 811 F.2d at 1305.

[18]Clougherty Packing Co. v. Commissioner, 811 F.2d at 1305.

[19]Clougherty Packing Co. v. Commissioner, 811 F.2d at 1307 (citing Moline Props., Inc. v. Commissioner, 319 U.S. 436 (1943)); see also Rent-A-Center, Inc., 142 T.C. at ___ (slip. op. at 17).

[*21] concurring opinion in Rent-A-Center, Inc. v. Commissioner, 142 T.C. ___, ___ (slip op. at 36-37) (Jan. 14, 2014).  In that case, we distinguished the facts of Malone & Hyde and Kidde on the basis that they all involved undercapitalized captives where the parent corporation provided indemnification or additional capitalization in order to persuade a third-policy insurer to issue policies.[20]  We did not address Hospital Corp.

A close examination of the facts of Hospital Corp. reveals that it is wholly consistent with our conclusion both here and in Rent-A-Center.  In Hospital Corp., various subsidiaries obtained most of their primary insurance through a captive insurance company.  Workers' compensation liabilities were handled differently.  The subsidiaries of Hospital Corporation obtained primary insurance for those liabilities with a third party, and the captive insurance company provided reinsurance.  When the third-party insurer became insolvent, the parent corporation agreed to indemnify it.  Later, the parent agreed to indemnify another third-party insurer as a condition of the agreement that it would take over the risks of the insolvent insurer (but only as to the liabilities of the insolvent insurer).  We held that there was no risk shifting as to the workers' compensation liability.

_____

[20]Rent-A-Center, Inc. v. Commissioner, 142 T.C. at ___ (slip op. at 36-37); see also id. at ___ (slip op. at 45-47) (Buch, J., concurring).

[*22] This falls squarely within our analysis in Rent-A-Center, where we distinguished a line of cases, stating that the parental guaranty at issue in Rent-A-Center did not shift the ultimate risk of loss; did not involve an undercapitalized captive; and was not issued to, or requested by, an unrelated insurer.[21] The indemnity agreement at issue in Hospital Corp. was issued to an unrelated insurer because of the insolvency of the primary insurer. That is very different from the facts before us here, where indemnity was not provided to a third-party insurer and where the captive insurer is sufficiently capitalized.

Respondent argues that the presence of the parental guaranty mitigates risk shifting because of the theoretical possibility that SHI may have to pay in accordance with the guaranty. However, this is the case whenever a guaranty from the parent is involved, and we have previously held that the existence of a parental guaranty by itself is not enough to justify disregarding the captive insurance arrangement.[22] The guaranty was provided only to preserve the tax-exempt status of Centaur and here, as in Rent-A-Center, no amount was paid out under the guaranty. Accordingly, we must decide whether something else was present to vitiate risk shifting.

---

[21]Rent-A-Center, Inc. v. Commissioner, 142 T.C. at ___ (slip op. at 37).

[22]Rent-A-Center, Inc. v. Commissioner, 142 T.C. at ___ (slip op. at 35-38).

[*23] Although respondent argues that Protectors was undercapitalized, we do not agree. After consulting with the Vermont regulators, Protectors decided to maintain a premium-to-surplus ratio of 7.5. to 1.0. At times, the SHI Group would have to provide additional capital or seek permission to avoid going above the 7.5 to 1.0 ratio. SHI Group's expert, Ann Conway, stated that the industry standard net premium-to-surplus ratio for long-tail casualty exposures,[23] which constitute most of the exposures here, is 4.0 to 1.0. Respondent's argument is that Protectors was undercapitalized because it did not maintain a premium-to-surplus ratio of 4.0 to 1.0 or lower. However, respondent fails to take into account the fact that Protectors' risks were reinsured. Because Protectors reinsured 100% of its risks through SGRL, Protectors' net premium-to-surplus ratio was 0 to 1, which falls below the industry standard. Ms. Conway testified that SGRL was adequately capitalized, and respondent did not refute this assertion. Considering the insurance and reinsurance contracts together, we find that Protectors was adequately capitalized for its role as a primary insurer that reinsured all of its risks with SGRL.

---

[23]Policies relating to workers' compensation, automobile liability, and general liability are typically referred to as long-tail coverage because "claims may involve damages that are not readily observable or injuries that are difficult to ascertain." Acuity, A Mut. Ins. Co., & Subs. v. Commissioner, T.C. Memo. 2013-209, at *8-*9.

[*24] Respondent further argues that the SHI Group financial arrangement resulted in SHI maintaining the risk of loss. Respondent maintains that Pinkerton's and SSUSA paid the claims of the operating subsidiaries and then sought reimbursement directly from SGRL, thus effectively eliminating Protectors from the captive arrangement. Because, in respondent's view, Protectors did not pay the claims as required, SGRL's legal obligation to reimburse Protectors did not arise, and Protectors' failure to pay the claims meant that SHI remained responsible. Again, we previously addressed a similar point and stated that "it is unrealistic to expect members of a consolidated group to cut checks to each other" and using journal entries to keep track of the flow of funds is "commonplace".[24] Pinkerton's and SSUSA kept records showing the amounts payable to and receivable from SGRL, and the parties have stipulated that the amount due to SGRL was first transferred to Protectors and then to SGRL. Respondent has not alleged, and we do not find, that the journal entries were inaccurate or incomplete. Accordingly, we do not agree that the SHI Group's manner of paying the claims and premiums prevented the risk from shifting.

---

[24]Rent-A-Center, Inc. v. Commissioner, 142 T.C. at ___ (slip op. at 49) (Buch, J., concurring) (citing Kahle v. Commissioner, T.C. Memo. 1991-203).

**[\*25]** On the basis of the foregoing and evaluating the captive arrangement as a whole, we find that the arrangement adequately shifted risk. The balance sheet and net worth analysis indicates that the captive insurance arrangement has shifted any economic consequence of a risk from the SHI Group subsidiaries to Protectors and then to SGRL.

### B. Risk Distribution

We evaluate risk distribution through the actions of the insurer. The insurer achieves risk distribution when it pools a large enough collection of unrelated risks, those that are not generally affected by the same circumstance or event.[25] "Distributing risk allows the insurer to reduce the possibility that a single costly claim will exceed the amount taken in as a premium * * * [because] [b]y assuming numerous relatively small, independent risks that occur randomly over time, the insurer smoothes out losses to match more closely its receipt of premiums."[26] Risk distribution incorporates the law of large numbers which has been described as follows: "'As the size of the pool increases, the chance that the loss per policy

---

[25]Rent-A-Center, Inc. v. Commissioner, 142 T.C. at ___ (slip op. at 38).

[26]Clougherty Packing Co. v. Commissioner, 811 F.2d at 1300.

**[\*26]** during any given period will deviate from the expected loss by a given amount (or proportion) declines.'"[27]

Protectors, and ultimately SGRL, insured five types of risks: workers' compensation, automobile, employment practice, general, and fidelity liabilities. During the years in issue the Securitas AB Group employed over 200,000 people in 20 countries, and the SHI Group, alone, employed approximately 100,000 people each year and operated over 2,250 vehicles. In 2003 SGRL received premiums from over 25 separate entities. In 2004 SGRL received premiums from over 45 separate entities. However, respondent argues that there is not adequate risk distribution because most of the premiums paid to SGRL were attributable to Protectors, and after mid-2003 most of those premiums were attributable to SSUSA.

Risk distribution is viewed from the insurer's perspective. As a result of the large number of employees, offices, vehicles, and services provided by the U.S. and non-U.S. operating subsidiaries, SGRL was exposed to a large pool of statistically independent risk exposures. This does not change merely because multiple companies merged into one. The risks associated with those companies did not vanish once they all fell under the same umbrella. As the SHI Group's

---

[27]AMERCO v. Commissioner, 96 T.C. at 33 n.14 (quoting expert witness).

[*27] expert, Dr. Neil Doherty, explained in his expert report: "It is the pooling of exposures that brings about the risk distribution--who owns the exposures is not crucial." We agree and find that by insuring the various risks of U.S. and non-U.S. subsidiaries, the captive arrangement achieved risk distribution.

### C. Insurance in the Commonly Accepted Sense

The final factor that we look to is whether the captive arrangement constitutes insurance in the commonly accepted sense. Previously, this Court has looked to factors such as whether: (1) the insurer was organized, operated, and regulated as an insurance company; (2) the insurer was adequately capitalized; (3) the insurance policies were valid and binding; (4) the premiums were reasonable; and (5) the premiums were paid and the losses were satisfied.[28]

Protectors and SGRL were both organized, operated, and regulated as insurance companies. Protectors was subject to regulation under the laws of Vermont, kept its own books and records, maintained separate bank accounts, prepared financial statements, and held meetings of its board of directors. Similarly, SGRL was regulated under the laws of Ireland and also kept its own

---

[28]See Rent-A-Center, Inc. v. Commissioner, 142 T.C. at ___ (slip op. at 39); Harper Grp. v. Commissioner, 96 T.C. at 60.

[*28] books and records, maintained separate bank accounts, prepared financial statements, and held meetings of its board of directors.

As stated above, Protectors was adequately capitalized. Further, Ms. Conway testified that SGRL was adequately capitalized on the basis of her finding that SGRL's financial ratio met or exceeded industry standards. Respondent did not challenge Ms. Conway's assertion, and we agree with it as well.

The insurance and reinsurance policies issued by Protectors and SGRL were valid and binding. Each insurance policy identified the insured, contained an effective period for the policy, specified what was covered by the policy, stated the premium amount, and was signed by an authorized representative of the company.

The premiums set by Protectors and SGRL were reasonable. They were reviewed by outside actuaries and determined to be within the range of reasonable premiums. Additionally, respondent does not challenge the reasonableness of the premium amounts.

Finally, the premiums were paid, and the losses were satisfied. The SHI Group subsidiaries kept ledger entries corresponding to the accounts payable and receivable. These amounts were booked pro rata on a monthly basis. During each year, the subsidiaries would pay Protectors the amounts due, which Protectors would then pay to SGRL after subtracting its ceding commission.

**[\*29]** Considering all the facts and circumstances, we find that the captive arrangement constituted insurance in the commonly accepted sense.

II. Conclusion

We find that the captive arrangement is insurance for Federal tax purposes. The captive arrangement shifted risk from the SHI Group to Protectors and ultimately to SGRL. Further, the captive arrangement distributed risk by insuring a large pool of differing risks. Lastly, the captive arrangement constitutes insurance in the commonly accepted sense. Accordingly, the premiums paid by the SHI Group are deductible under section 162 as insurance expenses.

To reflect the foregoing and the concessions of the parties,

Decision will be entered

for petitioner.