T.C. Memo. 2021-30

UNITED STATES TAX COURT

CAYLOR LAND & DEVELOPMENT, INC., ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 17204-13, 17205-13,      Filed March 10, 2021.
17223-13, 19238-13,
23921-13, 23922-13,
23931-13, 11348-14,
17919-14, 17920-14,
17921-14, 17922-14.

---

[1] We consolidated 12 cases for trial on the issues we analyze in this opinion: Data Wave Management, Inc., docket number 17205-13; Ibor Corp., docket number 17223-13; Robert C. Caylor, II and Margo D. Caylor, docket number 19238-13; Robert Caylor Construction Company, docket number 23921-13; Robert C. Caylor II Exempt Trust, docket number 23922-13; Robert C. Caylor and Clara E. Caylor, docket number 23931-13; Bantam, LLC, Robert C. Caylor, II Exempt Trust, Tax Matters Partner, docket number 11348-14; La Playa Caliente, LLC, Robert C. Caylor II Exempt Trust, Tax Matters Partner, docket number 17919-14; Vistoso LLC, Robert C. Caylor II Exempt Trust, Tax Matters Partner, docket number 17920-14; Bavispe Limited Partnership, Data Wave Management Inc., Tax Matters Partner, docket number 17921-14; and Mayfair Crest Limited Partnership, Ibor Corp., Tax Matters Partner, docket number 17922-14.

**[*2]**   <u>Derek W. Kaczmarek</u>, <u>David R. Jojola</u>, <u>Giselle C. Alexander</u>, <u>Jay Howard</u> <u>Zimbler</u>, and <u>John W. Treece</u>, for petitioners.

<u>Michael R. Harrel</u>, <u>Doreen Marie Susi</u>, <u>Wesley J. Wong</u>, and <u>John Robert</u> <u>Gordon</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


HOLMES, <u>Judge</u>:  Bob Caylor and his son Robert Caylor II (Rob) are entrepreneurs who built a thriving construction business and, in a difficult industry, have kept the business going for more than a half century.  Though it began as a sole proprietorship, it has since grown into an empire of many separate subsidiaries and affiliates.  And like all businesses, all of the Caylors' companies needed insurance.  They have long had traditional insurance, which typically cost the group around $60,000 each year.  Beginning in 2007, however, the Caylor entities increased their insurance bill by taking out policies from a related microcaptive insurer at a cost of $1.2 million annually.  At the same time, consulting payments between the Caylor entities grew by about $1.2 million. These developments were not unrelated.

**[\*3]**   In <u>Avrahami v. Commissioner</u>, 149 T.C. 144 (2017), we found that a microcaptive didn't actually provide insurance because it failed to distribute risk and didn't act as an insurer commonly would.  In <u>Reserve Mech. Corp. v. Commissioner</u>, T.C. Memo. 2018-86, 115 T.C.M. (CCH) 1475 (2018), <u>appeal filed</u>, No. 18-9011 (10th Cir. Dec. 20, 2018), we found that a microcaptive didn't actually provide insurance because it failed to distribute risk and didn't act as an insurer commonly would.  Then in <u>Syzygy Ins. Co. v. Commissioner</u>, T.C. Memo. 2019-34, 117 T.C.M. (CCH) 1165 (2019), we found that a microcaptive didn't actually provide insurance because it failed to distribute risk and didn't act as an insurer commonly would.

We will break no new ground today.

FINDINGS OF FACT

I.    <u>Background</u>

This story begins in Arizona back in 1958, when Bob Caylor, with the help of a loan from his wife Clara, started a small construction company which quickly grew into Robert Caylor Construction.  It started as a sole proprietorship, but Bob eventually incorporated the business--he officially formed Robert Caylor Construction Company (Caylor Construction) in 1961.  Caylor Construction was a commercial construction company with expertise as a general building contractor.

[*4] In an industry known for its volatility, Bob proved to be a steady leader and avoided overextending in good times.  Caylor Construction survived the bad times, and Bob became recognized in his community as a successful businessman.

Bob and Clara eventually had two children, Rob and Paula Caylor.  Rob and his wife Margo also had two children--Casey and Carly Caylor.  Rob began working for his father in 1973 when he was just nine.  Right after graduating from high school, Rob formed his own construction company--Caylor Land & Development Company (Caylor Land).  Caylor Land focused on commercial and residential contracting and consulting.  With his dad's helpful advice throughout the years, Rob managed to build Caylor Land into a successful business.

In the late 1990s Rob bought Caylor Construction.  As the companies grew, they sprouted many other subsidiaries and affiliates--not at all unusual for an industry where leveraged financing is common and every project carries some risk.  Here they are:

- RCMC, LLC:  An Arizona limited liability company which is solely owned by the Robert C. Caylor II Exempt Trust.  It provides maintenance and repair services, condominium-association management services, building-management services, and leasing services.

- La Playa Caliente, LLC:  An Arizona LLC owned equally by Robert C. Caylor II Exempt Trust and Margo.  La Playa develops and owns real estate.  During the years at issue it owned various real estate

[*5]    properties through a variety of single member LLCs.  Those are:  Two East LLC; 260 Pantano, LLC; Lot One on Hacienda, LLC; 6422, LLC; Next Door, LLC; and 1501 Cherry LLC.

- Bantam, LLC:  An Arizona LLC that specializes in governance and real-estate development issues in Pima County.  Its members are Robert C. Caylor II Exempt Trust with a 47.8% interest, Margo with a 47.8% interest, and Charles Cushman with a 4.4% interest.  It owns two industrial buildings built by Caylor Construction and developed by Caylor Land.

- Vistoso, LLC:  An Arizona LLC whose members are Robert C. Caylor II Exempt Trust and Margo--each with 50% ownership.  Vistoso develops and manages office space.  It also owns one office condo building and two condo units built by Caylor Construction.

- 7500 Broadway LLC:  An Arizona LLC that owns a single, partly paved parking lot.  Bob and Clara each own half.  This property was a former landfill before Bob bought it in the 1980s.

- Robert C. Caylor II Exempt Trust:  An irrevocable trust of which Rob is the trustee.  It owns shares of related operating companies and interests in some of the Caylor entities--100% of RCMC, 50% of La Playa and Vistoso, 47.8% of Bantam, 12.5% of Caylor Cotlow, and 0.5% of Bavispe.

- Data Wave Management, Inc.:  An Arizona C corporation that specializes in small businesses and startups.  It owns a 1% general partnership interest in Bavispe and is responsible for managing Bavispe's assets.  Its only shareholder is Bob.

- Ibor Corp.:  An Arizona C corporation owned by Rob and Margo in equal shares.  It owns a 1% general partnership interest in Mayfair Crest and is responsible for managing the day-to-day operations and assets of Mayfair.

[*6] ● Mayfair Crest Ltd. Partners: A limited partnership that is a funding mechanism for Caylor Construction that facilitates lines of credit and debt instruments for the various Caylor entities. Ibor is the general partner of Mayfair with a 1% interest. Its limited partners are Rob (44% interest), Margo (44%), Casey A. Caylor GST Trust (9%), and Carly A. Caylor Exempt Trust (2%).

● Bavispe, LLP: An Arizona limited partnership that is a real-estate holding company with a diverse range of investments. Data Wave is a general partner of Bavispe with a 1% interest. The limited partners are Rob and Clara (98.5% interest) and Robert C. Caylor II Exempt Trust (0.5%).

We will collectively refer to all these as the Caylor entities. And we find that Rob ran this empire primarily through Caylor Construction.

The fortunes of all these Caylor entities were closely tied to the fortune of Caylor Construction. In 2009, for example, Caylor Land had $1.4 million in gross receipts, of which $1.2 million was "consulting fees" received from Caylor Construction. Caylor Land, after it received this "consulting fee," turned around and paid "consulting fees" to several of the other subsidiaries. And these "consulting fees" turned out to be a significant part of the subsidiaries' revenues:

| [*7]<br><br>Recipient | Total revenues | Consulting fees received through Caylor Land | Percentage of revenue received through Caylor Land |
|---|---|---|---|
| 7500 Broadway | $37,830 | $36,180 | 95.6% |
| Bantam | 95,520 | 36,180[2] | 37.9[3] |
| Bavispe | 86,006 | 42,210 | 49.1 |
| Data Wave | 42,798 | 36,180 | 84.5 |
| Ibor | 144,972 | 144,720 | 99.8 |
| La Playa | 1,909,757 | 156,780 | 8.2 |
| Mayfair | 198,080 | 156,780 | 79.1 |
| RCMC | 352,090 | 271,695 | 77.2 |
| Caylor Trust | 204,478 | 60,300 | 29.5 |
| Vistoso | 38,980 | 36,180 | 92.8 |

This revenue breakdown shows that Caylor Construction was the driver of the success or failure of all the other Caylor entities--in a room full of mice, it was the 800-pound gorilla. From 2005 to 2008 Caylor Construction reported gross receipts of $11 million, $15.2 million, $26.1 million, and $20.6 million, respectively. When the Great Recession hit, Caylor Construction did not escape

---

[2] Bantam also received consulting fees from RCMC of $41,820 for tax year 2009, which means that it received a total of $78,000 in consulting fees from related companies.

[3] If one includes the RCMC payment, then 81.66% of Bantam's came from related companies.

**[\*8]** unscathed. Its revenues fell in 2009 and 2010, first to $8 million and then to $6.2 million.

## II. The Move to a Microcaptive[4]

### A. The Pitch

For nearly three decades Caylor Construction bought traditional third-party commercial property, casualty, and liability insurance through its longtime insurance broker, Tommy Gee. For the past 15 years Gee had brokered Caylor Construction's traditional insurance from the Cincinnati Insurance Co. Caylor Construction didn't skimp on this traditional insurance--it had the broadest policies available in the commercial-insurance marketplace covering:

- commercial property,

- general liability,

- umbrella/excess liability,

- electronic data processing,

- contractors equipment,

---

[4] A quick vocabulary lesson may be helpful at this point. A "captive insurance company" is a corporation whose stock is owned by one or a small number of companies and which handles all or a part of the insurance needs of its shareholders or their affiliates. Harper Grp. v. Commissioner, 96 T.C. 45, 46 n.3 (1991), aff'd, 979 F.2d 1341 (9th Cir. 1992). A "microcaptive" is a small captive insurance company. Avrahami v. Commissioner, 149 T.C. 144, 179 (2017). To be "small", the captive must take in less than $1.2 million in premiums. Id.

- installation floater,

- commercial auto, and

- terrorism.

These policies not only insured Caylor Construction, but also other Caylor entities and Rob's family:

- Caylor Land Development;

- Bob and Clara Caylor;

- Rob and Margo Caylor;

- Clara Caylor LLC;

- Fidelity National Title Trust No. 10270;

- Robert Caylor DBA Caylor Commercial Developers;

- Robert Caylor II DBA Robert Caylor Investment;

- Caylor Cotlow, LLC;

- Bavispe;

- Mayfair;

- Ibor;

- Caylor Trust;

- 6191 E. Miramar, LLC;

- La Playa;

[*10]

- Data Wave;

- 7500 Broadway;

- Caylor Construction;

- Two East;

- 6422 Speedway;

- Leandro, LLC;

- Lot One on Hacienda;

- Carly Caylor;

- Casey Caylor;

- Casey A. Caylor GST Trust;

- Carly A. Caylor Exempt Trust;

- Laplata Norte, LLC;

- RCMC;

- Next Door;

- 1501 Cherry;

- 260 Pantano;

- Bantam; and

- Vistoso.

[*11] From 2005-14, Caylor Construction paid the following premiums for itself and all the Caylor entities:

| Coverage period | Amount |
| --- | --- |
| Aug. 1, 2005 to Aug. 1, 2006 | $61,608 |
| Aug. 1, 2006 to Aug. 1, 2007 | 58,800 |
| Aug. 1, 2007 to Aug. 1, 2008 | 59,917 |
| Aug. 1, 2008 to Aug. 1, 2009 | 58,121 |
| Aug. 1, 2009 to Aug. 1, 2010 | 54,898 |
| Aug. 1, 2010 to Aug. 1, 2011 | 52,269 |
| Aug. 1, 2011 to Aug. 1, 2012 | 64,330 |
| Aug. 1, 2012 to Aug. 1, 2013 | 69,830 |
| Aug. 1, 2013 to Aug. 1, 2014 | 63,254 |

But this traditional insurance didn't cover *every* loss that the Caylor entities faced over the years. From 1997-2007, the Caylor entities had $500,000 of losses that were not covered by their traditional insurance--roughly $50,000 a year.

This gap in coverage irritated Rob. In early 2007 an acquaintance introduced him to the idea of a captive insurance company. Rob, along with his father and Richard Kennedy, his longtime accountant, went to a lunch presentation on captive insurance at the Tucson Country Club. This presentation was put on by Tribeca--an insurance-management company located in Arizona that specialized in

[*12] managing captive insurance companies.[5] The presentation was a primer on captive insurance and emphasized microcaptives and their potential tax benefits.

Rob was convinced after the presentation that the Caylor entities could benefit from such an arrangement--but Kennedy was less convinced, and presciently thought the pitch for a microcaptive "too good to be true." Rob asked Kennedy to look into Tribeca to see if there was anything bad about the company and to poke around captive insurance generally, to see if it was legitimate from a tax standpoint. Kennedy made clear that this area was outside of his expertise, but he searched the internet for information about captive insurance companies and checked with a friend at the State Board of Accountancy to see if there were any complaints against Tribeca. He concluded that captive insurance, if done correctly, had potential. But Kennedy also told Rob that he himself could not determine if Tribeca's specific program satisfied the Code's requirements, and we specifically find that this meant he told Rob that he was unsure if Tribeca's program would be able to deliver on the promised tax benefits.

Rob also asked Greg Gadarian, his longtime tax and business attorney, to look into captive insurance. Gadarian had already conducted some research for

---

[5] In December 2010 Tribeca was purchased by Artex Risk Solutions, Inc. Since the company was known as Tribeca for almost all the years at issue, we will refer to it as Tribeca throughout.

[*13] other clients, but he also acknowledged that he was no expert in the area. After Rob asked him, he read some articles on the subject and talked to another attorney who was more familiar with this area of law. After this brief inquiry, Gadarian came to the same conclusion that Kennedy did--that captive insurance was a legitimate concept, so long as it was "established correctly and operated correctly." And also like Kennedy, Gadarian didn't (or couldn't) advise Rob on whether Tribeca's specific program would satisfy the requirements laid out in the Code. We also note that Rob never asked Gee, his longtime insurance adviser, about whether to go forward with a captive and Tribeca.

B.    Formation

These general comments from Kennedy and Gadarian were good enough for Rob, and he decided to go forward in setting up a captive insurance company with Tribeca as its third-party manager. He began the process by answering a general questionnaire that Tribeca sent him. He signed an engagement letter with Tribeca in September 2007. The letter stated that the captive needed to meet certain "risk shifting" and "risk distribution" tests.[6] Things moved quickly. Within a month,

---

[6] To ensure adequate risk distribution, Tribeca required the captives it managed to participate in a risk pool. Caylor's captive never participated in this pool.

**[*14]** Tribeca prepared a feasability study for Caylor Construction. The study concluded that Caylor Construction was suitable for a captive insurance company.

The Caylors' captive insurance company, named Consolidated, Inc., was incorporated under the laws of Anguilla[7] and licensed as an Anguilla insurance company. It was owned by Rob. Tribeca filed the articles of incorporation for Consolidated on December 20, 2007. On December 21, Consolidated elected under section 953(d)[8] to be treated as a domestic U.S. corporation for tax purposes, as well as an election under section 831(b)(2)(A)(ii) to be taxed solely on investment income so long as its annual premiums did not exceed $1.2 million--which is what made Consolidated a *micro*captive. That same day Caylor Construction paid Consolidated $1.2 million, which it deducted as an insurance expense on its 2007 tax return.[9]

This was at least a bit odd, since Caylor Construction had not yet completed any underwriting questionnaires, and perhaps even odder because Consolidated

---

[7] Anguilla is an island of the British West Indies. See Monahan v. Commissioner, 109 T.C. 235, 236 (1997).

[8] All section references are to the Internal Revenue Code and regulations in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless we say otherwise.

[9] Caylor Construction files its returns on a calendar-year basis.

**[\*15]** had not yet underwritten or issued any policies to any of the Caylor entities. The record shows, and we find, that Caylor Construction did eventually fill out an underwriting questionnaire for 2007 by the end of May 2008. And Caylor Construction did eventually get policies that covered itself and several other Caylor entities: 7500 Broadway, Bavispe, Carly A. Caylor Exempt Trust, Casey A. Caylor GST Trust, Caylor Land, Data Wave, Ibor, La Playa, Mayfair, RCMC, Caylor Trust, and Caylor Construction. But what really made this first year remarkable was that the 2007 policies that Consolidated finally got around to issuing in 2008 were "claims-made" policies, which means that any claim had to be reported during the applicable policy period (or an extended reporting period of no more than 60 days). So when Caylor Construction paid $1.2 million at the end of 2007 to Consolidated--the same amount it would be paying during the years at issue for a year's worth of coverage--in reality it was receiving at most 10 days of coverage and possibly none at all.

The process became less hurried in 2008. The Caylor entities started to buy their own coverage from Consolidated, and each entity paid its own premiums. But as in 2007 the underwriting process for 2008 did not begin until after the 2008 coverage period had already closed.

**[*16]** C.     Execution

These oddities in the 2007 and 2008 policies are not our focus because the tax years before us are 2009 and 2010.  During both those years the Caylor entities also carried traditional commercial insurance.  From August 2008 to August 2011, Caylor Construction paid a total of $165,288--or roughly $55,000 per year--for this traditional insurance.  And just as in 2007 and 2008, on paper the Caylor entities supplemented their insurance through Consolidated in 2009 and 2010.

        1.     2009

Consolidated's coverage changed slightly in 2009.  Rob wanted two additional entities to get supplemental insurance through Consolidated--Vistoso and Bantam.  He completed the underwriting questionnaires for these two companies and returned them to Tribeca in March 2009.

But this addition was coupled with a subtraction.  The Carly Caylor and Casey Caylor Trusts were removed from Consolidated's program in July 2009, on the advice of the Caylors' CPA who suggested that the Caylors "not * * * pay insurance premiums through Casey's and Carly's Trust."

With these changes now in place, 12 Caylor entities paid premiums that added up to $1.2 million to Consolidated:

| [*17]                Entity | Premium payment to Consolidated |
|-----------------------------|---------------------------------|
| Caylor Construction         | $179,880                        |
| Caylor Land                 | 168,000                         |
| 7500 Broadway               | 36,000                          |
| Bantam                      | 78,000                          |
| Bavispe                     | 42,000                          |
| Data Wave                   | 36,000                          |
| Ibor                        | 144,000                         |
| La Playa                    | 168,000                         |
| Mayfair                     | 156,000                         |
| RCMC                        | 96,000                          |
| Caylor Trust                | 60,000                          |
| Vistoso                     | 36,000                          |
| Total                       | 1,199,880                       |

There was a problem. The Carly and Casey Caylor Trusts had already each paid $21,000 to Consolidated. After the Caylors' CPA suggested that the premiums shouldn't be paid through these trusts, Paula suggested that the trusts be "refunded" and their premium be "re[located] * * * amongst the remaining companies." And that's just what happened. Consolidated refunded the premiums paid by the trusts.

What protections any of these entities--the trusts or the corporations or the partnerships--were paying for wasn't actually known in 2009, since the 2009

**[*18]** policies, following the pattern of previous years, were not prepared until 2010. Gordon Gotzinger, Tribeca's director of risk management underwriting, didn't sign the declarations until August 2010, and Consolidated didn't deliver the policies to Rob until December 2010.

We do find that Consolidated did eventually produce policies for these entities--even if they were claims-made policies delivered well after the policy periods. Consolidated, however, wrote policies for only three of the entities: Caylor Construction, Caylor Land, and RCMC. The nine other entities--Mayfair, Ibor, La Playa, Caylor Trust, Bavispe, Data Wave, 7500 Broadway, Bantam, and Vistoso--were named "additional insureds" under RCMC's policies. Here are the policies:

| [*19]                   Insured | Policy |
|---|---|
| Caylor Construction | Administrative actions |
|  | Legal expense reimbursement |
| Caylor Land | Administrative actions |
|  | Legal expense reimbursement |
|  | Loss of key contract |
| RCMC, et al. | Administrative actions |
|  | Cyber liability |
|  | Legal expense reimbursement |
|  | Loss of key contract |
|  | Miscellaneous professional liability |
|  | Professional services reimbursement |

2.     2010

2010 looked much like 2009. The same Caylor entities paid Consolidated premiums that totaled $1.2 million. These payments were made throughout 2010. Here is the breakdown:

| Entity | Premium payment to Consolidated |
|---|---|
| Caylor Construction | $179,880 |
| Caylor Land | 168,000 |
| 7500 Broadway | 36,000 |
| Bantam | 78,000 |
| Bavispe | 42,000 |

| | |
|---|---|
| [*20] Data Wave | 36,000 |
| Ibor | 144,000 |
| La Playa | 168,000 |
| Mayfair | 156,000 |
| RCMC | 96,000 |
| Caylor Trust | 60,000 |
| Vistoso | 36,000 |
| Total | 1,199,880 |

These were exactly the same premiums as the Caylor entities had paid in 2009.

And again, as in 2009, the Caylor entities paid these premiums without knowing what policies they were paying for or the total premium amounts. The worksheet used to renew the policies wasn't returned to Tribeca until June 2010. Rob didn't sign and return the coverage acceptance forms to Tribeca until November 2010. Gotzinger didn't endorse the declaration pages until late January 2011, and they weren't delivered to Rob until April 2011. And these were again policies that covered only claims made before they were delivered.

The policies that were eventually produced were similar to 2009's:

| [*21]              Insured | Policy |
|---|---|
| Caylor Construction | Administrative actions |
|  | Extended warranty |
|  | Legal expense reimbursement |
| Caylor Land | Administrative actions |
|  | Legal expense reimbursement |
|  | Loss of key contract |
| RCMC, et al. | Administrative actions |
|  | Cyber liability |
|  | Legal expense reimbursement |
|  | Loss of key contract |
|  | Miscellaneous professional liability |
|  | Professional services reimbursement |

D.    The Flow of Funds

Another noteworthy aspect of these cases is how money found its way from Caylor Construction to Consolidated during these years.

1.    2009

The payment of Consolidated's 2009 premiums began on December 30, 2008 when Caylor Construction paid Caylor Land $1,224,160 for "consulting". Caylor Land's only workers in 2009 were Rob and Paula, and Carly and Casey-- who at the time were only 11 and 18 years old.  These consulting payments were

[*22] made without any contract between Caylor Construction and Caylor Land, and indeed without any records that described when the consultation took place, what advice was received, or even what subjects were discussed. When pressed at trial, Bob described what appears to be a morning routine for him and Rob to have breakfast together and discuss the business. It was during these conversations that most of the "consulting" seems to have taken place.

After Caylor Construction sent so much money to Caylor Land for consulting at the end of 2008, Caylor Land made two payments that totaled $168,000 to Consolidated in 2009. It then paid another $1.1 million for "professional-consulting fees"[10] to the other Caylor entities that were covered under Consolidated's program. As these entities got this "consulting" revenue, they spent it on insurance from Consolidated.[11] We made a table:

---

[10] This includes payments of $42,000 to both the Carly and Casey Trusts.

[11] When Consolidated refunded the premiums from the Carly Trust and Casey Trust, the trusts refunded Caylor Land for the "consulting" payments that they had received earlier that year.

| [*23]<br><br>Recipient | Consulting fees received from Caylor Land | Amount paid to Consolidated | Consulting income as a percentage of insurance |
|---|---|---|---|
| 7500 Broadway | $36,180 | $36,000 | 100.5% |
| Bantam | 36,180 | 78,000 | 46.4 |
| Bavispe | 42,210 | 42,000 | 100.5 |
| Data Wave | 36,180 | 36,000 | 100.5 |
| Ibor | 144,720 | 144,000 | 100.5 |
| La Playa | 156,780 | 168,000 | 93.3 |
| Mayfair | 156,780 | 156,000 | 100.5 |
| RCMC | 271,695 | 96,000 | 283.0 |
| Caylor Trust | 60,300 | 60,000 | 100.5 |
| Vistoso | 36,180 | 36,000 | 100.5 |

It is not by chance that the consulting payments match the premiums so closely. When Rob began making these payments in 2008, he made sure the consulting payments were slightly more than the premium payments so, as he put it in an email, "the payins do not match the payouts exactly."

###### 2. 2010

The next year was very similar. On December 30, 2009 Caylor Construction paid Caylor Land $1.7 million for consulting. There were no consulting agreements between Caylor Construction and Caylor Land, and no

[*24] records of when the consulting took place, what advice was received, or what subjects were discussed. Caylor Land's employees were still only Rob, Paula, and Rob's now slightly older children.

Caylor Land then paid Consolidated $168,000. It paid other Caylor entities that were part of Consolidated's insurance program $1.5 million for consulting. As in 2009, these consulting payments made up the bulk of the revenue for many of these entities. These other entities then paid premiums to Consolidated. Here's the breakdown:

| Recipient | Total revenue | Consulting fees received from Caylor Land | Percentage of total revenue from consulting | Amount paid to Consolidated | Consulting income as a percentage of insurance |
|---|---|---|---|---|---|
| 7500 Broadway | $37,108 | $36,018 | 97.1% | $36,000 | 100.05% |
| Bantam | 186,723 | 78,039 | 41.8 | 78,000 | 100.05 |
| Bavispe | 61,004 | 42,021 | 68.9 | 42,000 | 100.05 |
| Data Wave | 46,542 | 36,018 | 77.4 | 36,000 | 100.05 |
| Ibor | 145,187 | 144,072 | 99.2 | 144,000 | 100.05 |
| La Playa | 1,961,962 | 268,084 | 13.7 | 168,000 | 159.6 |
| Mayfair | 287,260 | 206,078 | 71.7 | 156,000 | 132.1 |
| RCMC | 555,308 | 546,048 | 98.3 | 96,000 | 568.8 |

| [*25] Caylor Trust | 173,528 | 60,030 | 34.6 | 60,000 | 100.05 |
|---|---|---|---|---|---|
| Vistoso | 53,523 | 36,018 | 67.3 | 36,000 | 100.05 |

E.    Claims Paid

All these premiums, for all these years, from all these Caylor entities began piling up--from 2007 to 2010, Consolidated collected $4.8 million.  It is therefore interesting to observe that in all that time, Consolidated paid only four claims--two in 2008 and two in 2009--that together amounted to only $43,000.[12]  And, inasmuch as these claims were made on claims-made policies that Consolidated didn't issue until after the policy years had closed, one might expect there to be something odd about them.  One would be right.  Let's take a look at the claims from 2009 (the only year before us that had claims filed with Consolidated).  The first claim in 2009 was for $13,000 in legal fees that Caylor Construction incurred to collect a debt.  Tribeca requested additional support for the claim--such as an invoice or proof of payment--but none was ever submitted.  Instead Rob and Paula in their capacities as Consolidated's owners overruled the captive managers at Tribeca and ordered that the claim be paid.  Consolidated issued a $13,000 check.

---

[12] No claims were filed in 2007 or 2010.

[*26] The second claim was filed by La Playa for several separate losses that included the settlement of several complaints and some legal fees. Tribeca again requested additional documentation for these claims--perhaps an invoice or proof of payment. It again received none. Rob and Paula again simply ordered Consolidated to pay the claim. We have the $10,000 check in the record. And both these claims were filed before Consolidated issued the policies under which they were made--indeed, before the policies were even underwritten.

III.    Returns, Audit, and Trial

For both 2009 and 2010, Caylor Construction deducted the payments that it made to Caylor Land as consulting expenses. All the other entities reported their payments to Consolidated as a combination of deductible insurance expenses, legal fees, accounting fees, and management fees.[13] Consolidated reported itself as a microcaptive, and therefore did not include the $1.2 million in premiums as taxable income for either year.

For both 2009 and 2010 Kennedy--who is a licensed CPA in Arizona--prepared the tax returns for almost all of the Caylor entities. The taxpayers provided anything that was requested. We specifically find that

---

[13] Despite this odd reporting by the Caylor entities, Consolidated itself recorded all these payments as "insurance premiums."

**[*27]** Kennedy was unable to advise the Caylors about whether Consolidated was properly operated as an insurance company. He never provided a tax opinion or memorandum about the requirements for a microcaptive insurance company to work under the Code. The Caylors didn't provide, and Kennedy did not ask for, any documents to support the large consulting fees between Caylor Construction and Caylor Land--he simply reported the information that was given to him. He was unaware that many of the Caylor entities were paying nearly 100% of their gross receipts from consulting on insurance premiums to Consolidated.

Though Rob had asked Gadarian to look into captives generally, Gadarian never provided him any written opinion or memorandum. Gadarian never reviewed any of the paperwork that created Consolidated or any of the tax returns. And apart from his general statements about captive insurance, we find it more likely than not that Gadarian gave no oral advice to Rob about Consolidated.

This microcaptive set off some alarms, and the Commissioner began to investigate. He eventually issued many notices of deficiency to the Caylors and

[*28] many of the Caylor entities.[14]  He also challenged the deductibility of the

consulting payments from Caylor Construction to Caylor Land.[15]

The Commissioner also asserts section 6662(a) accuracy-related penalties

for substantial understatement under section 6662(b)(2) or negligence under

section 6662(b)(1).

We tried these cases in Arizona.[16]  We are left to decide:

- whether the "consulting payments" made between Caylor Construction and Caylor Land were ordinary and necessary businesses expenses;

- whether the payments from the Caylor entities to Consolidated were "insurance expenses;" and

- whether any penalties are owed.

With our foundation laid, we can get to work.

_____

[14] Though we do note that the Commissioner does not challenge Consolidated's own returns in the cases that we tried.  Cf. Avrahami, 149 T.C. at 172; Syzygy, 117 T.C.M. (CCH) at 1171.

[15] In his amended answer the Commissioner does *not* deny the subsequent deductions from Caylor Land to the other Caylor entities.  Rather, he uses these deductions as an alternative argument that the payments from Caylor Construction to Caylor Land are not ordinary business expenses.

[16] The Caylors were and remain Arizonans; the Caylor entities all had their principal place of business or principal offices in Arizona, so all of the taxpayers in these cases were in Arizona.  Any appeals would presumptively go to the Ninth Circuit.  See sec. 7482(b)(1).

[*29]                              OPINION

I.    Consulting Payments

Section 162 allows the deduction of all ordinary and necessary business expenses. The cases tell us to be more skeptical about expenses between related parties. See, e.g., Harwood v. Commissioner, 82 T.C. 239, 258 (1984), aff'd without published opinion, 786 F.2d 1174 (9th Cir. 1986). The reason is that "expenses" from one related party to another are more likely to be distributions of profits, which are not deductible. See Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1243 (9th Cir. 1983), rev'g and remanding on other grounds T.C. Memo. 1980-282; Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. 1142, 1156 (1980). Still, it's entirely possible for one company legitimately to incur or pay business expenses to a related company. See Chapman v. Commissioner, T.C. Memo. 2014-82, 107 T.C.M. (CCH) 1433, 1435 (2014). To allay our suspicions, we look to see if there is any corroborating evidence related to these expenses-- invoices, records, dates, hours worked, or projects worked on. See ASAT, Inc. v. Commissioner, 108 T.C. 147, 174-75 (1997) (no deduction for consulting fees where no evidence of how fees are determined, no written contract, no detailed invoices, and no evidence of what might warrant consulting fees); Fuhrman v. Commissioner, T.C. Memo. 2011-236, 102 T.C.M. (CCH) 347, 348 (2011);

[*30] <u>Weekend Warrior Trailers, Inc. v. Commissioner</u>, T.C. Memo. 2011-105, 101 T.C.M. (CCH) 1506, 1519-20 (2011) (no deduction of management fees to related corporation without proof of specific services performed); <u>Kimm v. Commissioner</u>, T.C. Memo. 2003-215, 86 T.C.M. (CCH) 101, 103 (2003).

The Commissioner first challenges the deductibility of these "consulting" payments that Caylor Construction made to Caylor Land at the end of 2008 and 2009. The testimony and exhibits we have in the record cause us to find it more likely than not that this "consulting" consisted of conversations that Rob and his dad had over breakfast. Neither one could say what this consulting concerned, what subjects they discussed, or the amount of time they spent talking business instead of the ordinary subjects fathers and sons talk about. For a father and son to have a warm and loving relationship that helps sustain and grow the family business is admirable. But it's not deductible.

## II.  Insurance

Insurance premiums are deductible under section 162(a) as ordinary and necessary expenses if paid or incurred in connection with a trade or business. Sec. 1.162-1(a), Income Tax Regs. Insurance premiums are also included in income when received by insurance companies. <u>See</u> sec. 61; <u>Avrahami</u>, 149 T.C. at 174. Insurance companies are generally taxed on their income in the same manner as

[*31] other corporations. See sec. 831(a). And that's what made the $1.2 million in consulting deductions and premiums so likely to raise the IRS's bureaucratic eyebrows--that's the limit on premiums that an insurer can receive without owing tax. See secs. 501(c)(15), 831(b). An insurance company with premiums that don't exceed $1.2 million for the year can elect under section 831(b) to be taxed only on its investment income. Sec. 831(b)(1) and (2).[17]

These rules are more complicated when the insurer and the insureds are related. This is because while insurance is deductible, amounts set aside in a loss reserve as a form of self-insurance are not. See, e.g., Harper Grp. v. Commissioner, 96 T.C. 45, 46 (1991), aff'd, 979 F.2d 1341 (9th Cir. 1992); see also Steere Tank Lines, Inc. v. United States, 577 F.2d 279, 280 (5th Cir. 1978); Spring Canyon Coal Co. v. Commissioner, 43 F.2d 78, 80 (10th Cir. 1930). But neither the Code nor the regulations actually defines "insurance." Securitas Holdings, Inc. v. Commissioner, T.C. Memo. 2014-225, 108 T.C.M. (CCH) 490, 494 (2014). As with anything that lacks a codified definition, we look to caselaw.

The Supreme Court has stated that insurance is a transaction that involves "an actual 'insurance risk'" and that "[h]istorically and commonly insurance

---

[17] We reviewed the history of these provisions in Avrahami, 149 T.C. at 175-76.

[*32] involves risk-shifting and risk-distributing." Helvering v. Le Gierse, 312 U.S. 531, 539 (1941). The line between nondeductible self-insurance and deductible insurance is blurry, and we try to clarify it by looking to four nonexclusive but rarely supplemented criteria:

- risk-shifting;

- risk-distribution;

- insurance risk; and

- whether an arrangement looks like commonly accepted notions of insurance.

See Avrahami, 149 T.C. at 177; Rent-A-Center, Inc. v. Commissioner, 142 T.C. 1, 13 (2014); see also R.V.I. Guar. Co. v. Commissioner, 145 T.C. 209, 225 (2015); Harper Grp., 96 T.C. at 58; AMERCO & Subs. v. Commissioner, 96 T.C. 18, 38 (1991), aff'd 979 F.2d 162 (9th Cir. 1992); Securitas, 108 T.C.M. (CCH) at 494.

To determine whether Consolidated's policies were insurance, we will use the same four-part test that we have in the past. In our three prior microcaptive cases, we have focused on the elements of risk distribution and "commonly accepted notions of insurance." See Avrahami, 149 T.C. at 181-97; Syzygy, 117 T.C.M. (CCH) at 1172-76; Reserve Mech, 115 T.C.M. (CCH) at 1483-90.

We will do so again here.

[*33]  A.    Risk Distribution

Risk distribution is one of the common characteristics of insurance

identified by the Supreme Court, see Le Gierse, 312 U.S. at 539, and courts will

find it when an insurer pools a large enough collection of unrelated risks,

Avrahami, 149 T.C. at 181; see also Rent-A-Center, 142 T.C. at 24.  "By assuming

numerous relatively small, independent risks that occur randomly over time, the

insurer smoothes out losses to match more closely its receipt of premiums."

Clougherty Packing Co. v. Commissioner, 811 F.2d 1297, 1300 (9th Cir. 1987),

aff'g 84 T.C. 948 (1985).

In each of our previous microcaptive-insurance cases the captive tried to

show risk distribution by investing in an "insurance pool"--a way to reinsure a

large number of geographically diverse third parties.  See, e.g., Avrahami, 149

T.C. at 163.  In each case, we found that the "insurance pool" wasn't actually

insurance so it didn't suffice to show risk distribution.  See id., 149 T.C. at 190;

Syzygy, 117 T.C.M. (CCH) at 1172-74; Reserve, 115 T.C.M (CCH) at 1484-85.

Tribeca told its clients that they had to participate in such a pool to have adequate

risk distribution.  Consolidated nonetheless chose not to.

That's not the end of this case, however.  The other way that microcaptive

insurers in our first three cases tried to show that they met the risk-distribution

**[\*34]** requirement was by issuing policies to its own brother and sister entities. See Avrahami, 149 T.C. at 182; Syzygy, 117 T.C.M. (CCH) at 1173; Reserve, 115 T.C.M (CCH) at 1484-85. We asked in those cases: "[W]as there a large enough pool of unrelated risk?" See, e.g., Avrahami, 149 T.C. at 182. The question is not solely about the *number* of brother-sister entities insured, but the number of independent *risk exposures*. Id. at 183. This was a problem in all three of those recent cases. In each we found there wasn't a large enough pool of unrelated risk from the policies issued to the related entities. See id. at 184 (seven types of policies to four entities fell short); Syzygy, 117 T.C.M. (CCH) at 1169 (eight policies to one entity fell short); Reserve, 115 T.C.M. (CCH) at 1479-80 (eleven or thirteen policies for three entities fell short).

The Commissioner argues, relying heavily on his expert Dr. David Babbel, that Consolidated didn't have enough independent risks. In Babbel's opinion, the risks faced by Consolidated--the 12 independent exposures for administrative action, 11 independent exposures for loss of key contract, 10 for cyberliability, and 1 for extended warranty--made for much too small a risk pool. But a low number of independent risks wasn't the only reason for Babbel's opinion. He observed that all of the risks that Consolidated faced were heavily tied to one entity--Caylor Construction. This is itself a problem. The strong correlation of

**[*35]** risk between the smaller Caylor entities and Caylor Construction prevented Consolidated, in his opinion, from having adequate risk distribution. The taxpayers disagree and argue that risk distribution can be achieved one of three ways:

- insuring a number of unrelated risks sufficient to allow the law of large numbers to predict expected losses;

- having risks of at least 12 affiliated companies, none of which has liability coverage of less than 5% nor more than 15% of the total risk insured by the insurance; *or*

- arranging for at least 30% of the risks assumed by the insurance company to be those of unrelated parties.

Going in reverse order, Consolidated didn't assume at least 30% risks from unrelated parties. Consolidated had *zero* risks from unrelated parties. This one fails.

Next, Consolidated did not insure at least 12 affiliated companies, *none of which had liability coverage for less than 5% nor more than 15% of the total risk by Consolidated*. Even with the inclusion of separate Caylor entities, the risk insured--as determined by the taxpayers' own expert--was extremely concentrated in just two companies, while the rest had only minimal risk. According to the taxpayers' own expert, two companies--Caylor Construction and La Playa Caliente--each had more than 30% of the group's total risk exposure, while seven

**[*36]** companies--Caylor Land, RCMC, Ibor, Data Wave, 7500 Broadway, Bantam, and Vistoso--each had less than 5%. We find the taxpayer's expert entirely credible in his explanation of these numbers. It aligns him, however, with Babbel's testimony that the high concentration of risk means there isn't sufficient risk distribution here. This also fails.

The third way that Caylor argues that Consolidated adequately distributed risk is the law of large numbers--that Consolidated insures a sufficient number of unrelated risks to allow the law of large numbers to predict losses. This is not entirely off base--we stated in Avrahami that independent risk exposure is the key. Avrahami, 149 T.C. at 183. But this is called the law of *large* numbers--not *small* numbers or *some* numbers. Our caselaw demonstrates how very large these numbers must be. In Harper Group, the captive insured 7,500 customers covering more than 30,000 different shipments and 6,722 special cargo policies. Harper Grp., 96 T.C. at 51. This meant more than 260,000 air shipments; 18,000 air flights; and 40,000 shipments on more than 3,000 ocean voyages were covered. Id. In Rent-A-Center, the captive insured three types of risks--workers' compensation, automobile, and general liability. Rent-A-Center, 142 T.C. at 2. It insured 14,000 employees; 7,000 vehicles; and 2,600 stores. Id. at 2. And in R.V.I. Guaranty, the insurance company insured one *type* of risk, the residual

[*37] value of assets.  R.V.I. Guar., 145 T.C. at 212.  But even there, the insurance company issued 951 policies covering 714 different insured parties with more than 754,000 passenger vehicles; more than 2,000 individual real-estate properties; and more than 1.3 million commercial-equipment assets.  Id. at 214.

There is no precise number of independent risks that must exist for risk to be sufficiently distributed to meet this element--we're not a legislature or regulator, and that's not the way common-law concepts become clearer over time. The problem for Consolidated is that it faces a number of independent risks that are at least a couple orders of magnitude smaller than the captives in cases where we've found sufficient distribution of risk.  During the years at issue there were *at most* 12 independent exposures for administrative-action and legal-expense reimbursement; 11 independent exposures for loss of key contracts; 10 for cyberliability, miscellaneous professional liability, and professional-services reimbursement; and 1 for extended warranty.  We find on the basis of this record that the law of large numbers doesn't apply to such small numbers.  On this issue Babbel is the more credible witness.

We also find in the alternative that the majority of the risks Consolidated faced weren't *independent* risks.  During trial, both parties played with the metaphor of a teeter-totter.  Babbel testified that the Caylor entities were all so

[*38] dependent on Caylor Construction that it was like having a bunch of mice on one side and an 800-pound gorilla on the other with no way for Consolidated to balance the risk that Caylor Construction carried compared to the other entities. The taxpayers took exception to the analogy and argued that the insured's revenue earned doesn't correlate to the risk Consolidated needed to distribute.

Tribeca, however, calculated premiums for the Caylor entities based on revenue, which suggests that revenue is some indicator of the risk Consolidated was purporting to insure. Even if revenue isn't the only measure of risk, we do find as a matter of fact that each of the Caylor entities was highly dependent on Caylor Construction. Many of the entities received all or most of their revenue from Caylor Construction. Many had no clients other than Caylor Construction. And if something were to happen to Caylor Construction or a policy followed by Caylor Construction was found to be faulty, it would have a severe effect on all of the other entities. We also think it important that although the Caylor entities are a big player in the Tucson real-estate market, the group is almost entirely limited to that market. This means that there was no geographic diversity or industry diversity in the entities that Consolidated insured. All the entities in one way or another were a part of the real-estate industry. And all the entities were in Tucson.

**[*39]** This lack of diversity also supports our finding that the risks insured by Consolidated were not sufficiently distributed.

And absent sufficient risk distribution, what Consolidated was providing was not insurance.

B.      Commonly Accepted Sense

While the absence of risk distribution is enough to demolish this scheme, AMERCO, 96 T.C. at 40, we will as an alternative ground look to see if what Consolidated was selling was an arrangement that looks like commonly accepted notions of insurance, see Avrahami, 149 T.C. at 190-91.  There is a hint of question begging here--we say something's not insurance because it doesn't look enough like something we do say is insurance--but it is one of the four criteria precedent tells us to look for.  And one can view it as simply a command to engage in analogical reasoning--there is an ordinary public meaning of the word "insurance" widespread in society that people ascribe to contracts without much thought.  A court can then look at novel arrangements that might or might not look like those contracts in various ways and pronounce whether their differences with commonly held notions of insurance are important in any particular case.  Precedent suggests that we look at:

**[\*40]** ● whether the company was organized, operated, and regulated as an insurance company;

● whether the insurer was adequately capitalized;

● whether the policies were valid and binding;

● whether the premiums were reasonable and the result of an arm's-length transaction; and

● whether claims were paid.

See, e.g., Avrahami, 149 T.C. at 191; R.V.I., 145 T.C. at 231. We have also looked at whether the policies covered risks people typically insure and if there was a legitimate business reason for buying insurance through a captive. See Hosp. Corp. of Am. v. Commissioner, T.C. Memo. 1997-482, 74 T.C.M. (CCH) 1020, 1038 (1997).

The Caylors argue that Consolidated is just like every other run-of-the-mill insurance company. They say it was properly regulated and had adequate capitalization. It paid its claims when they were filed. It had premiums that were actuarially determined by a third-party captive-management company and those premiums were actually paid by the Caylor entities. But the Commissioner isn't convinced. He has four main issues with Consolidated--when it issued its policies, how it calculated the premiums it charged, how it processed claims, and what the Commissioner says were the sheer exuberant excess of those premiums.

[*41]      1.      <u>Organization, Operation, and Regulation</u>

The parties agree that Consolidated was incorporated in Anguilla and filed a request there to be regulated as an insurance agency. They disagree a bit about whether Anguilla ever granted Consolidated's request and whether Consolidated also needed to follow Arizona's insurance regulations. The question of whether Arizona regulations apply to an alien insurance corporation turns out to be an especially thorny legal issue. We don't think either of their disagreements matters to the outcome, so we will leave them for another day. <u>See</u> <u>LTV Corp. v. Commissioner</u>, 64 T.C. 589, 595 (1975).

The more telling question is whether Consolidated operated as an insurance company. Nancy Harman[18] and Babbel both credibly testified that Consolidated was not operated like a normal insurance company. Harman testified that the process of pricing policies was "very different" from the process everywhere else she had worked--no other company backed into the premium amount the way Consolidated and Tribeca did. And Babble testified that he had never seen a real insurance company issue policies after the period being insured--a practice that

---

[18] Harman is an insurance underwriter who has worked in several areas of insurance--from personal to commercial--and for several companies. She also worked for Tribeca from 2006 to 2009 as a captive manager. We find her testimony entirely credible.

[*42] appeared to be standard operating procedure for Consolidated and Tribeca.[19]

He stated "[t]his isn't how insurance companies typically operate let alone four

years in a row."

To answer this question ourselves, we "must look beyond the formalities

and consider the realities of the purported insurance transaction." Hosp. Corp. of

Am., 74 T.C.M. (CCH) at 1037. The realities do not help Consolidated here. We

find Harman was credible in her testimony that Consolidated's pricing of its

policies was abnormal. We also find Babbel credible that Consolidated's

operation was entirely abnormal.

We ourselves find that Consolidated's handling of claims was abnormal.

The claims that the Caylors and the Caylor entities made during the years at issue

were handled quite differently from how typical insurance companies respond to

their policy holders. It's common enough for an insurance company to ask for

---

[19] Babbel also gave his opinion that the payment of $1.2 million from Caylor Construction to Consolidated for only 10 days of coverage was not typical in the insurance industry. We recognize that this monster payment for 10 days of coverage that was nearly the same as the Caylors paid for a full year's worth of coverage did not itself occur in a tax year before us. But we consider facts from years not before us to make findings for years that are. Sec. 6214(b); see, e.g., Chaganti v. Commissioner, T.C. Memo. 2016-222, 112 T.C.M. (CCH) 629, 634 (2016), aff'd per curiam, 745 F. App'x 259 (8th Cir. 2018). This particular fact shows how much more likely it is that Consolidated is self-insurance, if not just a tax-avoidance scheme.

[*43] more information from its client when it receives a claim. And Tribeca on behalf of Consolidated did do that here; but instead of giving that information, the policy holders just told Consolidated to pay, and Consolidated obeyed. See Avrahami, 149 T.C. at 192 (approving claims without support is abnormal).

Even if Consolidated was organized and regulated as an insurance company, we find it was not operated like one.

### 2. Capitalization

We next look at capitalization. The parties agree that Consolidated met the minimum capitalization requirements of Anguilla. This is the same as adequate capitalization. See id. at 193. No issue here.

### 3. Valid and Binding Policies

In Securitas, we found valid and binding policies when "[e]ach insurance policy identified the insured, contained an effective period for the policy, specified what was covered by the policy, stated the premium amount, and was signed by an authorized representative of the company." Securitas, 108 T.C.M. (CCH) at 497; see also Avrahami, 149 T.C. at 194; R.V.I., 145 T.C. at 231.

The "policies" provided by Consolidated are the most glaring evidence it wasn't an insurance company. During the years at issue (as well as in 2007 and 2008) Consolidated, with the help of Tribeca, didn't provide policies for the

**[*44]** Caylor entities until *after* the claims periods ended. For 2009, the policies were not prepared until 2010. The declarations weren't signed by Gotzinger until August 2010, and they weren't delivered to Rob until December 2010. The Caylor entities paid premiums to Consolidated without knowing the total premiums for each and without knowing what those policies would be for that year. Two claims were even paid on policies that had not yet been written.

Much the same occurred for 2010. Rob didn't sign and return coverage acceptance forms to Tribeca until November 2010. Gotzinger didn't endorse the declaration page until January 2011, and these policies weren't delivered to Rob until April 2011.

Writing and delivering "claims made" insurance policies *after* the claim period is, we find, abnormal and is to any reasonable observer just plain silly. Insurance protects against the risk of loss. See Steven Plitt et al., 1 Couch on Ins., sec. 1.6 n.2 (3d ed. 2020). A policy written *after* the claims period is being written after there is no longer a risk of loss, which defeats the whole purpose of insurance. And the experts back us up on our intuition. As we stated above, Babbel credibly testified that writing the policies after the claims period is not normal for an insurance company. See supra p. 42. And Harman testified that the pricing of policies after the period had closed, while common at Tribeca and

**[\*45]** Consolidated, was abnormal in the insurance industry.  We find--in strong terms--that this is not normal behavior.[20]

### 4.    Reasonable Premiums

The next question is whether Consolidated's premiums were reasonable and the result of an arm's-length transaction.  See Avrahami, 149 T.C. at 194-95.  We have two issues with the premiums here--one macro and one micro.

Our macro issue is that Consolidated charged, and the Caylor entities paid, a total of $1.2 million per year in premiums.  That's not by itself a sign that something isn't like the commonly accepted notions of insurance.  But Rob testified that this insurance was viewed as additional protection from uncovered claims in the past.  And in the 10 years leading up to Consolidated's formation, the Caylor entities had incurred only $500,000 in what the Caylors called uncovered claims--roughly $50,000 per year.  While we don't think that any premium over $50,000 per year would be *per se* unreasonable,[21] a premium that is so much

---

[20] There is one other minor point of abnormality we must point out.  The Caylors never consulted Gee, their longtime insurance adviser, about the policies they were receiving from Consolidated and Tribeca.  If this was truly insurance, we wonder why the Caylors never even asked Gee what kind of policies they should obtain to supplement their traditional insurance.

[21] For example, a company may be willing to pay a slightly higher premium to fix its costs.

**[*46]** higher--$1,150,000 higher to be specific--looks unreasonable and thus likely to be for something other than "insurance" as that term is commonly understood.[22]

On the micro side we also take issue with how the premiums were calculated.[23] Rather than starting with the Caylor entities' historical losses--which credible testimony showed would have been standard practice in the industry--Tribeca started with the total premium amount the Caylor entities as a whole wished to pay, and then created and priced policies that would fit within this limit. We acknowledge that Tribeca may have feared that a ten-year loss history would not have enough data, but ignoring it completely doesn't make sense either. Neither does ignoring new information during all four years Consolidated provided insurance--Consolidated (through Tribeca) never adjusted its premiums based on the loss history of the Caylor entities.

The calculations of the premiums also made little sense. Gotzinger, in calculating the premiums, started in a normal place--the ISO (Insurance Services

---

[22] Another minor microabnormality is found in *who* paid for the insurance. Caylor Construction paid the premiums for its traditional insurance that covered all the entities. But with Consolidated, the covered entities each paid their own premiums--a departure from what appears to be the longtime standard practice with its traditional insurance.

[23] We note that the actual underwriter of the policies had died before trial and left no testimony behind.

**[\*47]** Office) base rate.[24]  But the calculations soon took a detour to crazy town. Several adjustments were made to these base rates which had the effect of raising the premiums for each policy--which makes sense only as an effort to increase the total premium to the desired $1.2 million.

The most glaring example of these adjustments was something called a "captive risk factor" adjustment.  Tribeca said this adjustment's purpose was to inflate premiums to allow captives to grow in financial strength.  It did in fact do this--fiddling with this factor increased premiums by 300%.  But this factor is completely unknown in the conventional insurance industry.  Roberta Garland, an actuary whose testimony we find credible, criticized the use of this factor.  She stated it is not widely used in the industry.  Or perhaps we should find that she *under*stated this--as far as she knew only Tribeca used this factor.  She concluded that Tribeca's premiums were excessive.  Babbel credibly criticized the use of this factor as well, arguing that its use is "economically futile" and "contrary to common insurance industry practice."

We find that the premiums weren't actuarially determined, and their parameters and assumptions were not properly documented.

---

[24] ISO is an industry data collection and rating agency.  ISO base rate attempts to capture the "pure loss costs" per exposure unit (such as revenue) by state.

**[\*48]**       5.       Payment of Claims

Finally we look at whether Consolidated paid its claims.  The simple answer is yes.  But we already discussed the abnormal way these claims were paid. See supra p. 44.

Does all this add up to "insurance in the commonly accepted sense?"  We find it more likely than not that the answer is "no".  Consolidated may have been organized and regulated as an insurance company, paid the claims filed against it, and met the minimal capitalization requirements of Anguilla.  But it also calculated premiums in a fanciful way in entirely unreasonable amounts, issued claims-made policies after the time to make claims had expired, and paid the few claims that it did on the say-so of its clients.

We find that it did not operate like an insurance company.

C.      Not Insurance

Because we find that Consolidated failed to distribute risk and was not selling insurance in the commonly accepted sense, we need not decide whether its transactions involved insurance risk or risk shifting.  See, e.g., Clougherty, 811 F.2d at 1300 n.5.  Despite the attempts of Consolidated to make its transactions look like traditional insurance and take advantage of the apparent loophole at the intersection of section 831 and captive-insurance caselaw, the premiums paid to

**[\*49]** Consolidated and deducted by the Caylor entities are not "insurance" for federal tax purposes. <u>See, e.g.</u>, <u>Avrahami</u>, 149 T.C. at 197. As in <u>Avrahami</u>, as in <u>Syzygy</u>, and as in <u>Reserve</u>, we find that the microcaptive didn't actually provide insurance because it failed to distribute risk and didn't act as an insurer commonly would.

III.    <u>Penalties</u>

Our last issue is whether any of this justifies accuracy-related penalties under section 6662(a). We now know that if the Commissioner wants penalties, he himself must have laid the foundation by complying with section 6751. The parties have settled this issue here with a stipulation that the Commissioner complied with section 6751(b) in only seven of these cases.

With that in place, we can put up a framework for the merits. Section 6662(a) imposes a 20% penalty on the portion of an underpayment of tax attributable to any substantial understatement of income tax, sec. 6662(b)(2), or negligence or disregard of rules or regulations, sec. 6662(b)(1). An understatement is substantial if it exceeds the greater of $10 million or "10 percent of the tax required to be shown on the return for the taxable year (or, if greater, $10,000)." Sec. 6662(d)(1)(B). Negligence includes any failure to make a

**[\*50]** reasonable attempt to comply with the provisions of the Code; and disregard includes any careless, reckless, or intentional disregard. Sec. 6662(c).

Almost all the taxpayers--as a matter of arithmetic--substantially understated their tax liabilities.[25] And we find in the alternative that the taxpayers were also negligent. Negligence includes failure to keep adequate books and records. See sec. 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs. It also includes failure to do what a reasonable and prudent person would do under the circumstances. See sec. 1.6662-3(b)(1), Income Tax Regs.; Neely v. Commissioner, 85 T.C. 934, 947 (1985). Negligence is strongly indicated when a taxpayer fails to reasonably attempt to "ascertain the correctness of a deduction * * * on a return which would seem to a reasonable and prudent person to be 'too good to be true' under the circumstances." Sec. 1.6662-3(b)(1)(ii), Income Tax Regs.

Rob was pitched the idea of a microcaptive as a "tax planning solution" and a "tax planning tool." The presentation he attended stated that this scheme would provide "a tax deduction of up to $1,200,000 * * * per year." A sophisticated businessman like Rob should have seen this as "too good to be true." Kennedy

---

[25] The Commissioner concedes there are no substantial understatements for Caylor Land for 2010 and Data Wave for 2009 and 2010.

[*51] even told Rob that this scheme seemed "too good to be true." This impels us to find that Rob didn't make reasonable attempts to ensure his and his businesses' entitlements to these deductions. We do find that Kennedy and Gadarian did some research into captive insurance for Rob, and we do find that both told Rob that a microcaptive insurance company is a legitimate concept. They're right about that. But they're also right that it's a legitimate concept only if "established correctly and operated correctly." Neither advised Rob that *this* microcaptive was established and operated correctly. And other than Tribeca--which is unable to offer an unbiased opinion--Rob never investigated if this scheme was operated correctly. Rob didn't even follow Tribeca's advice--which was to invest in the insurance pool to ensure risk distribution--which itself is unreasonable. And apart from the deductions of Consolidated's premiums, Caylor Construction failed to keep adequate records of its deductions for "consulting" payments. Those were negligent too. See sec. 6662(c).

The Caylors try to shore up this position with section 6664(c)--the reasonable-cause-and-good-faith defense. See sec. 1.6664-4(a), Income Tax Regs. We make our determinations about this defense on a case-by-case basis. Sec. 1.6664-4(b), Income Tax Regs. And here we look to see if it applies to either the consulting payments or the microcaptive scheme. The Caylors argue that they

[*52] relied on professionals to advise them on how to report these items on their returns. The Caylors argue that they can establish this defense through the advice of Gadarian and Kennedy.

We must first determine if these parties gave the Caylor entities any "advice". Advice is "any communication * * * setting forth the analysis or conclusion of a person * * * provided to (or for the benefit of) the taxpayer and on which the taxpayer relies." Sec. 1.6664-4(c)(2), Income Tax Regs.

We specifically find that the Caylor entities received no advice from Gadarian or Kennedy regarding Consolidated or its insurance scheme. Gadarian credibly testified that he never offered any advice about the organization and operation of Consolidated. Kennedy credibly testified that he never offered any advice about the organization or operation of Consolidated. This finding is different from those we made in our other microcaptive cases. In Avrahami, 149 T.C. at 207, the taxpayers received actual advice from a tax professional whom they relied on in good faith. In Syzygy, 117 T.C.M. (CCH) at 1177, the taxpayers again received actual advice from a tax professional that they relied on in good faith. The Caylor entities can, in contrast, not rely on advice that was not given. We find that they had no reasonable cause and did not take their position in good faith.

**[\*53]** Caylor Construction also cannot shelter in place behind section 6664(c) for the consulting payments.  Again, the taxpayers argue that Kennedy prepared their returns and therefore the defense applies.  Employing a tax return preparer, however, doesn't allow taxpayers to avoid penalties.  <u>Neonatology Assocs., P.A. v. Commissioner</u>, 115 T.C. 43, 100 (2000), <u>aff'd</u>, 299 F.3d 221 (3d Cir. 2002).  Kennedy simply copied information handed to him on a general ledger onto a tax return.  Kennedy and the Caylors never discussed these payments, which means the Caylors did not get advice or a professional's judgment that they could have reasonably relied upon.  <u>See</u> <u>Flume v. Commissioner</u>, T.C. Memo. 2020-80, 119 T.C.M. (CCH) 1545 (2020); <u>Yapp v. Commissioner</u>, T.C. Memo. 2018-147, 116 T.C.M. (CCH) 270 (2018), <u>aff'd</u>, 818 F. App'x 743 (9th Cir. 2020).

Penalties apply across the board.  There will be some calculations needed from the parties, and because this involves some TEFRA cases,

<u>Appropriate orders will be issued</u>.